# LUJAN, SECRETARY OF THE INTERIOR *v.* DEFENDERS OF WILDLIFE ET AL.

No. 90–1424.   Argued December 3, 1991—Decided June 12, 1992

SCALIA, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A, and IV, in which REHNQUIST, C. J., and WHITE, KENNEDY, SOUTER, and THOMAS, JJ., joined, and an opinion with respect to Part III–B, in which REHNQUIST, C. J., and WHITE and THOMAS, JJ., joined. KENNEDY, J., filed an opinion concurring in part and concurring in the judgment, in which SOUTER, J., joined, *post,* p. 579. STEVENS, J., filed an opinion concurring in the judgment, *post,*

p. 581. BLACKMUN, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 589.

*Edwin S. Kneedler* argued the cause for petitioner. With him on the briefs were *Solicitor General Starr, Acting Assistant Attorney General Hartman, Deputy Solicitor General Wallace, Robert L. Klarquist, David C. Shilton, Thomas L. Sansonetti,* and *Michael Young.*

*Brian B. O'Neill* argued the cause for respondents. With him on the brief were *Steven C. Schroer* and *Richard A. Duncan.**

JUSTICE SCALIA delivered the opinion of the Court with respect to Parts I, II, III–A, and IV, and an opinion with respect to Part III–B, in which THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE THOMAS join.

This case involves a challenge to a rule promulgated by the Secretary of the Interior interpreting § 7 of the Endangered

---

*\*Terence P. Ross, Daniel J. Popeo,* and *Richard A. Samp* filed a brief for the Washington Legal Foundation et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the City of Austin et al. by *William A. Butler, Angus E. Crane, Michael J. Bean, Kenneth Oden, James M. McCormack,* and *Wm. Robert Irvin;* for the American Association of Zoological Parks & Aquariums et al. by *Ronald J. Greene* and *W. Hardy Callcott;* for the American Institute of Biological Sciences by *Richard J. Wertheimer* and *Charles M. Chambers;* and for the Ecotropica Foundation of Brazil et al. by *Durwood J. Zaelke.*

A brief of *amici curiae* was filed for the State of Texas et al. by *Patrick J. Mahoney, Dan Morales,* Attorney General of Texas, *Will Pryor,* First Assistant Attorney General, *Mary F. Keller,* Deputy Attorney General, and *Nancy N. Lynch, Mary Ruth Holder,* and *Shannon J. Kilgore,* Assistant Attorneys General, *Grant Woods,* Attorney General of Arizona, *Winston Bryant,* Attorney General of Arkansas, *Daniel E. Lungren,* Attorney General of California, *Robert A. Butterworth,* Attorney General of Florida, *Michael E. Carpenter,* Attorney General of Maine, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Robert J. Del Tufo,* Attorney General of New Jersey, *Robert Abrams,* Attorney General of New York, *Lee Fisher,* Attorney General of Ohio, and *Jeffrey L. Amestoy,* Attorney General of Vermont, *Victor A. Kovner, Leonard J. Koerner, Neal M. Janey,* and *Louise H. Renne.*

Species Act of 1973 (ESA), 87 Stat. 892, as amended, 16 U. S. C. § 1536, in such fashion as to render it applicable only to actions within the United States or on the high seas. The preliminary issue, and the only one we reach, is whether respondents here, plaintiffs below, have standing to seek judicial review of the rule.

I

The ESA, 87 Stat. 884, as amended, 16 U. S. C. § 1531 *et seq.*, seeks to protect species of animals against threats to their continuing existence caused by man. See generally *TVA* v. *Hill*, 437 U. S. 153 (1978). The ESA instructs the Secretary of the Interior to promulgate by regulation a list of those species which are either endangered or threatened under enumerated criteria, and to define the critical habitat of these species. 16 U. S. C. §§ 1533, 1536. Section 7(a)(2) of the Act then provides, in pertinent part:

> "Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical." 16 U. S. C. § 1536(a)(2).

In 1978, the Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS), on behalf of the Secretary of the Interior and the Secretary of Commerce respectively, promulgated a joint regulation stating that the obligations imposed by § 7(a)(2) extend to actions taken in foreign nations. 43 Fed. Reg. 874 (1978). The next year, however, the Interior Department began to reexamine its position. Letter from Leo Kuliz, Solicitor, Department of the Interior, to Assistant Secretary, Fish and Wildlife and Parks, Aug. 8, 1979. A revised joint regulation, reinterpret-

ing § 7(a)(2) to require consultation only for actions taken in the United States or on the high seas, was proposed in 1983, 48 Fed. Reg. 29990, and promulgated in 1986, 51 Fed. Reg. 19926; 50 CFR 402.01 (1991).

Shortly thereafter, respondents, organizations dedicated to wildlife conservation and other environmental causes, filed this action against the Secretary of the Interior, seeking a declaratory judgment that the new regulation is in error as to the geographic scope of § 7(a)(2) and an injunction requiring the Secretary to promulgate a new regulation restoring the initial interpretation. The District Court granted the Secretary's motion to dismiss for lack of standing. *Defenders of Wildlife* v. *Hodel*, 658 F. Supp. 43, 47–48 (Minn. 1987). The Court of Appeals for the Eighth Circuit reversed by a divided vote. *Defenders of Wildlife* v. *Hodel*, 851 F. 2d 1035 (1988). On remand, the Secretary moved for summary judgment on the standing issue, and respondents moved for summary judgment on the merits. The District Court denied the Secretary's motion, on the ground that the Eighth Circuit had already determined the standing question in this case; it granted respondents' merits motion, and ordered the Secretary to publish a revised regulation. *Defenders of Wildlife* v. *Hodel*, 707 F. Supp. 1082 (Minn. 1989). The Eighth Circuit affirmed. 911 F. 2d 117 (1990). We granted certiorari, 500 U. S. 915 (1991).

## II

While the Constitution of the United States divides all power conferred upon the Federal Government into "legislative Powers," Art. I, § 1, "[t]he executive Power," Art. II, § 1, and "[t]he judicial Power," Art. III, § 1, it does not attempt to define those terms. To be sure, it limits the jurisdiction of federal courts to "Cases" and "Controversies," but an executive inquiry can bear the name "case" (the Hoffa case) and a legislative dispute can bear the name "controversy" (the Smoot-Hawley controversy). Obviously, then, the Constitution's central mechanism of separation of powers de-

pends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts. In The Federalist No. 48, Madison expressed the view that "[i]t is not infrequently a question of real nicety in legislative bodies whether the operation of a particular measure will, or will not, extend beyond the legislative sphere," whereas "the executive power [is] restrained within a narrower compass and . . . more simple in its nature," and "the judiciary [is] described by landmarks still less uncertain." The Federalist No. 48, p. 256 (Carey and McClellan eds. 1990). One of those landmarks, setting apart the "Cases" and "Controversies" that are of the justiciable sort referred to in Article III—"serv[ing] to identify those disputes which are appropriately resolved through the judicial process," *Whitmore* v. *Arkansas*, 495 U. S. 149, 155 (1990)—is the doctrine of standing. Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III. See, *e. g.*, *Allen* v. *Wright*, 468 U. S. 737, 751 (1984).

Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, see *id.*, at 756; *Warth* v. *Seldin*, 422 U. S. 490, 508 (1975); *Sierra Club* v. *Morton*, 405 U. S. 727, 740–741, n. 16 (1972);[1] and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Whitmore, supra,* at 155 (quoting *Los Angeles* v. *Lyons*, 461 U. S. 95, 102 (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Simon* v. *Eastern Ky. Welfare*

---

[1] By particularized, we mean that the injury must affect the plaintiff in a personal and individual way.

*Rights Organization,* 426 U. S. 26, 41–42 (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.,* at 38, 43.

The party invoking federal jurisdiction bears the burden of establishing these elements. See *FW/PBS, Inc.* v. *Dallas,* 493 U. S. 215, 231 (1990); *Warth, supra,* at 508. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i. e.,* with the manner and degree of evidence required at the successive stages of the litigation. See *Lujan* v. *National Wildlife Federation,* 497 U. S. 871, 883–889 (1990); *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 114–115, and n. 31 (1979); *Simon, supra,* at 45, n. 25; *Warth, supra,* at 527, and n. 6 (Brennan, J., dissenting). At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *National Wildlife Federation, supra,* at 889. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial." *Gladstone, supra,* at 115, n. 31.

When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has

caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *ASARCO Inc.* v. *Kadish,* 490 U. S. 605, 615 (1989) (opinion of KENNEDY, J.); see also *Simon, supra,* at 41–42; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. *E. g., Warth, supra,* at 505. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish. *Allen, supra,* at 758; *Simon, supra,* at 44–45; *Warth, supra,* at 505.

## III

We think the Court of Appeals failed to apply the foregoing principles in denying the Secretary's motion for summary judgment. Respondents had not made the requisite demonstration of (at least) injury and redressability.

## A

Respondents' claim to injury is that the lack of consultation with respect to certain funded activities abroad "increas[es] the rate of extinction of endangered and threatened species." Complaint ¶ 5, App. 13. Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of

standing. See, *e. g.*, *Sierra Club* v. *Morton*, 405 U. S., at 734. "But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.*, at 734–735. To survive the Secretary's summary judgment motion, respondents had to submit affidavits or other evidence showing, through specific facts, not only that listed species were in fact being threatened by funded activities abroad, but also that one or more of respondents' members would thereby be "directly" affected apart from their " 'special interest' in th[e] subject." *Id.*, at 735, 739. See generally *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 343 (1977).

With respect to this aspect of the case, the Court of Appeals focused on the affidavits of two Defenders' members— Joyce Kelly and Amy Skilbred. Ms. Kelly stated that she traveled to Egypt in 1986 and "observed the traditional habitat of the endangered nile crocodile there and intend[s] to do so again, and hope[s] to observe the crocodile directly," and that she "will suffer harm in fact as the result of [the] American . . . role . . . in overseeing the rehabilitation of the Aswan High Dam on the Nile . . . and [in] develop[ing] . . . Egypt's . . . Master Water Plan." App. 101. Ms. Skilbred averred that she traveled to Sri Lanka in 1981 and "observed th[e] habitat" of "endangered species such as the Asian elephant and the leopard" at what is now the site of the Mahaweli project funded by the Agency for International Development (AID), although she "was unable to see any of the endangered species"; "this development project," she continued, "will seriously reduce endangered, threatened, and endemic species habitat including areas that I visited . . . [, which] may severely shorten the future of these species"; that threat, she concluded, harmed her because she "intend[s] to return to Sri Lanka in the future and hope[s] to be more fortunate in spotting at least the endangered elephant and leopard." *Id.*, at 145–146. When Ms. Skilbred was asked

at a subsequent deposition if and when she had any plans to return to Sri Lanka, she reiterated that "I intend to go back to Sri Lanka," but confessed that she had no current plans: "I don't know [when]. There is a civil war going on right now. I don't know. Not next year, I will say. In the future." *Id.*, at 318.

We shall assume for the sake of argument that these affidavits contain facts showing that certain agency-funded projects threaten listed species—though that is questionable. They plainly contain no facts, however, showing how damage to the species will produce "imminent" injury to Mses. Kelly and Skilbred. That the women "had visited" the areas of the projects before the projects commenced proves nothing. As we have said in a related context, " 'Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.' " *Lyons*, 461 U. S., at 102 (quoting *O'Shea* v. *Littleton*, 414 U. S. 488, 495–496 (1974)). And the affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the "actual or imminent" injury that our cases require. See *supra*, at 560.[2]

---

[2] The dissent acknowledges the settled requirement that the injury complained of be, if not actual, then at least *imminent*, but it contends that respondents could get past summary judgment because "a reasonable finder of fact could conclude . . . that . . . Kelly or Skilbred will soon return to the project sites." *Post*, at 591. This analysis suffers either from a factual or from a legal defect, depending on what the "soon" is supposed to mean. If "soon" refers to the standard mandated by our precedents— that the injury be "imminent," *Whitmore* v. *Arkansas*, 495 U. S. 149, 155 (1990)—we are at a loss to see how, as a factual matter, the standard can be met by respondents' mere profession of an intent, some day, to

Besides relying upon the Kelly and Skilbred affidavits, respondents propose a series of novel standing theories. The first, inelegantly styled "ecosystem nexus," proposes that any person who uses *any part* of a "contiguous ecosystem" adversely affected by a funded activity has standing even if the activity is located a great distance away. This approach, as the Court of Appeals correctly observed, is inconsistent with our opinion in *National Wildlife Federation,* which held that a plaintiff claiming injury from environmental dam-

---

return. But if, as we suspect, "soon" means nothing more than "in this lifetime," then the dissent has undertaken quite a departure from our precedents. Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is " "*"certainly* impending," " " *id.,* at 158 (emphasis added). It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. In such circumstances we have insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all. See, *e. g., id.,* at 156–160; *Los Angeles* v. *Lyons,* 461 U. S. 95, 102–106 (1983).

There is no substance to the dissent's suggestion that imminence is demanded only when the alleged harm depends upon "the affirmative actions of third parties beyond a plaintiff's control," *post,* at 592. Our cases *mention* third-party-caused contingency, naturally enough; but they also mention the plaintiff's failure to show that he will soon expose *himself* to the injury, see, *e. g., Lyons, supra,* at 105–106; *O'Shea* v. *Littleton,* 414 U. S. 488, 497 (1974); *Ashcroft* v. *Mattis,* 431 U. S. 171, 172–173, n. 2 (1977) *(per curiam).* And there is certainly no reason in principle to demand evidence that third persons will take the action exposing the plaintiff to harm, while *presuming* that the plaintiff himself will do so.

Our insistence upon these established requirements of standing does not mean that we would, as the dissent contends, "demand . . . detailed descriptions" of damages, such as a "nightly schedule of attempted activities" from plaintiffs alleging loss of consortium. *Post,* at 593. That case and the others posited by the dissent all involve *actual* harm; the existence of standing is clear, though the precise extent of harm remains to be determined at trial. Where there is no actual harm, however, its imminence (though not its precise extent) must be established.

age must use the area affected by the challenged activity and not an area roughly "in the vicinity" of it. 497 U. S., at 887–889; see also *Sierra Club*, 405 U. S., at 735. It makes no difference that the general-purpose section of the ESA states that the Act was intended in part "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," 16 U. S. C. § 1531(b). To say that the Act protects ecosystems is not to say that the Act creates (if it were possible) rights of action in persons who have not been injured in fact, that is, persons who use portions of an ecosystem not perceptibly affected by the unlawful action in question.

Respondents' other theories are called, alas, the "animal nexus" approach, whereby anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing; and the "vocational nexus" approach, under which anyone with a professional interest in such animals can sue. Under these theories, anyone who goes to see Asian elephants in the Bronx Zoo, and anyone who is a keeper of Asian elephants in the Bronx Zoo, has standing to sue because the Director of the Agency for International Development (AID) did not consult with the Secretary regarding the AID-funded project in Sri Lanka. This is beyond all reason. Standing is not "an ingenious academic exercise in the conceivable," *United States* v. *Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U. S. 669, 688 (1973), but as we have said requires, at the summary judgment stage, a factual showing of perceptible harm. It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist. It is even plausible—though it goes to the outermost limit of plausibility—to think that a person who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm, since some animals that

might have been the subject of his interest will no longer exist, see *Japan Whaling Assn.* v. *American Cetacean Society*, 478 U. S. 221, 231, n. 4 (1986). It goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection.[3]

---

[3] The dissent embraces each of respondents' "nexus" theories, rejecting this portion of our analysis because it is "unable to see how the distant location of the destruction *necessarily* (for purposes of ruling at summary judgment) mitigates the harm" to the plaintiff. *Post*, at 594–595. But summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* v. *Catrett*, 477 U. S. 317, 322 (1986). Respondents had to adduce facts, therefore, on the basis of which it could reasonably be found that concrete injury to their members was, as our cases require, "certainly impending." The dissent may be correct that the geographic remoteness of those members (here in the United States) from Sri Lanka and Aswan does not *"necessarily"* prevent such a finding—but it assuredly does so when no further facts have been brought forward (and respondents have produced none) showing that the impact upon animals in those distant places will in some fashion be reflected here. The dissent's position to the contrary reduces to the notion that distance *never* prevents harm, a proposition we categorically reject. It cannot be that a person with an interest in an animal automatically has standing to enjoin federal threats to that species of animal, anywhere in the world. Were that the case, the plaintiff in *Sierra Club*, for example, could have avoided the necessity of establishing anyone's use of Mineral King by merely identifying one of its members interested in an endangered species of flora or fauna at that location. JUSTICE BLACKMUN's accusation that a special rule is being crafted for "environmental claims," *post*, at 595, is correct, but *he* is the craftsman.

JUSTICE STEVENS, by contrast, would allow standing on an apparent "animal nexus" theory to all plaintiffs whose interest in the animals is "genuine." Such plaintiffs, we are told, do not have to visit the animals because the animals are analogous to family members. *Post*, at 583–584, and n. 2. We decline to join JUSTICE STEVENS in this Linnaean leap. It is unclear to us what constitutes a "genuine" interest; how it differs from

## B

Besides failing to show injury, respondents failed to demonstrate redressability. Instead of attacking the separate decisions to fund particular projects allegedly causing them harm, respondents chose to challenge a more generalized level of Government action (rules regarding consultation), the invalidation of which would affect all overseas projects. This programmatic approach has obvious practical advantages, but also obvious difficulties insofar as proof of causation or redressability is concerned. As we have said in another context, "suits challenging, not specifically identifiable Government violations of law, but the particular programs agencies establish to carry out their legal obligations . . . [are], even when premised on allegations of several instances of violations of law, . . . rarely if ever appropriate for federal-court adjudication." *Allen,* 468 U. S., at 759–760.

The most obvious problem in the present case is redressability. Since the agencies funding the projects were not parties to the case, the District Court could accord relief only against the Secretary: He could be ordered to revise his regulation to require consultation for foreign projects. But this would not remedy respondents' alleged injury unless the funding agencies were bound by the Secretary's regulation, which is very much an open question. Whereas in other contexts the ESA is quite explicit as to the Secretary's controlling authority, see, *e. g.,* 16 U. S. C. § 1533(a)(1) ("The Secretary shall" promulgate regulations determining endangered species); § 1535(d)(1) ("The Secretary is authorized to provide financial assistance to any State"), with respect to consultation the initiative, and hence arguably the initial responsibility for determining statutory necessity, lies with

---

a "nongenuine" interest (which nonetheless prompted a plaintiff to file suit); and why such an interest in animals should be different from such an interest in anything else that is the subject of a lawsuit.

the agencies, see § 1536(a)(2) (*"Each Federal agency shall*, in consultation with and with the assistance of the Secretary, insure that any" funded action is not likely to jeopardize endangered or threatened species) (emphasis added). When the Secretary promulgated the regulation at issue here, he thought it was binding on the agencies, see 51 Fed. Reg. 19928 (1986). The Solicitor General, however, has repudiated that position here, and the agencies themselves apparently deny the Secretary's authority. (During the period when the Secretary took the view that § 7(a)(2) did apply abroad, AID and FWS engaged in a running controversy over whether consultation was required with respect to the Mahaweli project, AID insisting that consultation applied only to domestic actions.)

Respondents assert that this legal uncertainty did not affect redressability (and hence standing) because the District Court itself could resolve the issue of the Secretary's authority as a necessary part of its standing inquiry. Assuming that it is appropriate to resolve an issue of law such as this in connection with a threshold standing inquiry, resolution by the District Court would not have remedied respondents' alleged injury anyway, because it would not have been binding upon the agencies. They were not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced.[4] The

---

[4] We need not linger over the dissent's facially impracticable suggestion, *post*, at 595–596, that one agency of the Government can acquire the power to direct other agencies by simply claiming that power in its own regulations and in litigation to which the other agencies are not parties. As for the contention that the other agencies will be "collaterally estopped" to challenge our judgment that they are bound by the Secretary of the Interior's views, because of their participation in this suit, *post*, at 596–597: Whether or not that is true now, it was assuredly not true when this suit was filed, naming the Secretary alone. "The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Newman-Green, Inc.* v. *Alfonzo-Larrain*, 490 U. S. 826, 830 (1989) (empha-

Court of Appeals tried to finesse this problem by simply proclaiming that "[w]e are satisfied that an injunction requiring the Secretary to publish [respondents' desired] regulatio[n] . . . would result in consultation." *Defenders of Wildlife,* 851 F. 2d, at 1042, 1043–1044. We do not know what would justify that confidence, particularly when the Justice Department (presumably after consultation with the agencies) has taken the position that the regulation is not binding.[5] The

sis added). It cannot be that, by later participating in the suit, the State Department and AID retroactively created a redressability (and hence a jurisdiction) that did not exist at the outset.

The dissent's rejoinder that redressability *was* clear at the outset because the *Secretary* thought the regulation binding on the agencies, *post,* at 598–599, n. 4, continues to miss the point: The *agencies* did not *agree* with the Secretary, nor would they be bound by a district court holding (as to this issue) in the Secretary's favor. There is no support for the dissent's novel contention, *ibid.,* that Rule 19 of the Federal Rules of Civil Procedure, governing joinder of indispensable parties, somehow alters our longstanding rule that jurisdiction is to be assessed under the facts existing when the complaint is filed. The redressability element of the Article III standing requirement and the "*complete* relief" referred to by Rule 19 are not identical. Finally, we reach the dissent's contention, *post,* at 599, n. 4, that by refusing to waive our settled rule for purposes of this case we have made "federal subject-matter jurisdiction . . . a one-way street running the Executive Branch's way." That is so, we are told, because the Executive can dispel jurisdiction where it previously existed (by either conceding the merits or by pointing out that nonparty agencies would not be bound by a ruling), whereas a plaintiff cannot retroactively create jurisdiction based on postcomplaint litigation conduct. But *any* defendant, not just the Government, can dispel jurisdiction by conceding the merits (and presumably thereby suffering a judgment) or by demonstrating standing defects. And permitting a defendant to point out a preexisting standing defect late in the day is not remotely comparable to permitting a plaintiff to *establish* standing on the basis of the defendant's litigation conduct occurring after standing is erroneously determined.

[5] Seizing on the fortuity that the case has made its way to *this* Court, JUSTICE STEVENS protests that no agency would ignore "an authoritative construction of the [ESA] by this Court." *Post,* at 585. In that he is probably correct; in concluding from it that plaintiffs have demonstrated redressability, he is not. Since, as we have pointed out above, standing

short of the matter is that redress of the only injury in fact respondents complain of requires action (termination of funding until consultation) by the individual funding agencies; and any relief the District Court could have provided in this suit against the Secretary was not likely to produce that action.

A further impediment to redressability is the fact that the agencies generally supply only a fraction of the funding for a foreign project. AID, for example, has provided less than 10% of the funding for the Mahaweli project. Respondents have produced nothing to indicate that the projects they have named will either be suspended, or do less harm to listed species, if that fraction is eliminated. As in *Simon*, 426 U. S., at 43–44, it is entirely conjectural whether the non-agency activity that affects respondents will be altered or affected by the agency activity they seek to achieve.[6] There is no standing.

## IV

The Court of Appeals found that respondents had standing for an additional reason: because they had suffered a "procedural injury." The so-called "citizen-suit" provision of the ESA provides, in pertinent part, that "any person may com-

---

is to be determined as of the commencement of suit; since at that point it could certainly not be known that the suit would reach this Court; and since it is not likely that an agency would feel compelled to accede to the legal view of a district court expressed in a case to which it was not a party; redressability clearly did not exist.

[6] The dissent criticizes us for "overlook[ing]" memoranda indicating that the Sri Lankan Government solicited and required AID's assistance to mitigate the effects of the Mahaweli project on endangered species, and that the Bureau of Reclamation was advising the Aswan project. *Post*, at 600–601. The memoranda, however, contain no indication whatever that the projects will cease or be less harmful to listed species in the absence of AID funding. In fact, the Sri Lanka memorandum suggests just the opposite: It states that AID's role will be to *mitigate* the "'negative impacts to the wildlife,'" *post*, at 600, which means that the termination of AID funding would *exacerbate* respondents' claimed injury.

mence a civil suit on his own behalf (A) to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter." 16 U. S. C. § 1540(g). The court held that, because § 7(a)(2) requires interagency consultation, the citizen-suit provision creates a "procedural righ[t]" to consultation in all "persons"—so that *anyone* can file suit in federal court to challenge the Secretary's (or presumably any other official's) failure to follow the assertedly correct consultative procedure, notwithstanding his or her inability to allege any discrete injury flowing from that failure. 911 F. 2d, at 121–122. To understand the remarkable nature of this holding one must be clear about what it does *not* rest upon: This is not a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs (*e. g.*, the procedural requirement for a hearing prior to denial of their license application, or the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them).[7] Nor is it simply a case where concrete injury has been suffered by many persons, as in mass fraud or mass tort situations. Nor, finally, is it the

---

[7] There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years. (That is why we do not rely, in the present case, upon the Government's argument that, *even if* the other agencies were obliged to consult with the Secretary, they might not have followed his advice.) What respondents' "procedural rights" argument seeks, however, is quite different from this: standing for persons who have no concrete interests affected—persons who live (and propose to live) at the other end of the country from the dam.

unusual case in which Congress has created a concrete private interest in the outcome of a suit against a private party for the Government's benefit, by providing a cash bounty for the victorious plaintiff. Rather, the court held that the injury-in-fact requirement had been satisfied by congressional conferral upon *all* persons of an abstract, self-contained, noninstrumental "right" to have the Executive observe the procedures required by law. We reject this view.[8]

We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that

---

[8] The dissent's discussion of this aspect of the case, *post*, at 601–606, distorts our opinion. We do *not* hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing. The dissent, however, asserts that there exist "classes of procedural duties . . . so enmeshed with the prevention of a substantive, concrete harm that an individual plaintiff may be able to demonstrate a sufficient likelihood of injury just through the breach of that procedural duty." *Post*, at 605. If we understand this correctly, it means that the Government's violation of a certain (undescribed) class of procedural duty satisfies the concrete-injury requirement by itself, without any showing that the procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed). We cannot agree. The dissent is unable to cite a single case in which we actually found standing solely on the basis of a "procedural right" unconnected to the plaintiff's own concrete harm. Its suggestion that we did so in *Japan Whaling Assn.* v. *American Cetacean Soc.*, 478 U. S. 221 (1986), and *Robertson* v. *Methow Valley Citizens Council*, 490 U. S. 332 (1989), *post*, at 602–603, 605, is not supported by the facts. In the former case, we found that the environmental organizations had standing because the "whale watching and studying of their members w[ould] be adversely affected by continued whale harvesting," see 478 U. S., at 230–231, n. 4; and in the latter we did not so much as mention standing, for the very good reason that the plaintiff was a citizens' council for the area in which the challenged construction was to occur, so that its members would obviously be concretely affected, see *Methow Valley Citizens Council* v. *Regional Forester*, 833 F. 2d 810, 812–813 (CA9 1987).

no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy. For example, in *Fairchild* v. *Hughes*, 258 U. S. 126, 129–130 (1922), we dismissed a suit challenging the propriety of the process by which the Nineteenth Amendment was ratified. Justice Brandeis wrote for the Court:

> "[This is] not a case within the meaning of . . . Article III . . . . Plaintiff has [asserted] only the right, possessed by every citizen, to require that the Government be administered according to law and that the public moneys be not wasted. Obviously this general right does not entitle a private citizen to institute in the federal courts a suit . . . ." *Ibid.*

In *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923), we dismissed for lack of Article III standing a taxpayer suit challenging the propriety of certain federal expenditures. We said:

> "The party who invokes the power [of judicial review] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally. . . . Here the parties plaintiff have no such case. . . . [T]heir complaint . . . is merely that officials of the executive department of the government are executing and will execute an act of Congress asserted to be unconstitutional; and this we are asked to prevent. To do so would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and co-equal department, an authority which plainly we do not possess." *Id.*, at 488–489.

In *Ex parte Lévitt*, 302 U. S. 633 (1937), we dismissed a suit contending that Justice Black's appointment to this Court violated the Ineligibility Clause, Art. I, § 6, cl. 2.

"It is an established principle," we said, "that to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public." 302 U. S., at 634. See also *Doremus* v. *Board of Ed. of Hawthorne*, 342 U. S. 429, 433–434 (1952) (dismissing taxpayer action on the basis of *Mellon*).

More recent cases are to the same effect. In *United States* v. *Richardson*, 418 U. S. 166 (1974), we dismissed for lack of standing a taxpayer suit challenging the Government's failure to disclose the expenditures of the Central Intelligence Agency, in alleged violation of the constitutional requirement, Art. I, § 9, cl. 7, that "a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time." We held that such a suit rested upon an impermissible "generalized grievance," and was inconsistent with "the framework of Article III" because "the impact on [plaintiff] is plainly undifferentiated and 'common to all members of the public.'" *Richardson, supra,* at 171, 176–177. And in *Schlesinger* v. *Reservists Comm. to Stop the War*, 418 U. S. 208 (1974), we dismissed for the same reasons a citizen-taxpayer suit contending that it was a violation of the Incompatibility Clause, Art. I, § 6, cl. 2, for Members of Congress to hold commissions in the military Reserves. We said that the challenged action, "standing alone, would adversely affect only the generalized interest of all citizens in constitutional governance . . . . We reaffirm *Lévitt* in holding that standing to sue may not be predicated upon an interest of th[is] kind . . . ." *Schlesinger, supra,* at 217, 220. Since *Schlesinger* we have on two occasions held that an injury amounting only to the alleged violation of a right to have the Government act in accordance with law was not judicially cognizable because

"'assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning.'" *Allen,* 468 U. S., at 754; *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.,* 454 U. S. 464, 483 (1982). And only two Terms ago, we rejected the notion that Article III permits a citizen suit to prevent a condemned criminal's execution on the basis of "'the public interest protections of the Eighth Amendment'"; once again, "[t]his allegation raise[d] only the 'generalized interest of all citizens in constitutional governance' . . . and [was] an inadequate basis on which to grant . . . standing." *Whitmore,* 495 U. S., at 160.

To be sure, our generalized-grievance cases have typically involved Government violation of procedures assertedly ordained by the Constitution rather than the Congress. But there is absolutely no basis for making the Article III inquiry turn on the source of the asserted right. Whether the courts were to act on their own, or at the invitation of Congress, in ignoring the concrete injury requirement described in our cases, they would be discarding a principle fundamental to the separate and distinct constitutional role of the Third Branch—one of the essential elements that identifies those "Cases" and "Controversies" that are the business of the courts rather than of the political branches. "The province of the court," as Chief Justice Marshall said in *Marbury* v. *Madison,* 1 Cranch 137, 170 (1803), "is, solely, to decide on the rights of individuals." Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive. The question presented here is whether the public interest in proper administration of the laws (specifically, in agencies' observance of a particular, statutorily prescribed procedure) can be converted into an individual right by a statute that denominates it as such, and

that permits all citizens (or, for that matter, a subclass of citizens who suffer no distinctive concrete harm) to sue. If the concrete injury requirement has the separation-of-powers significance we have always said, the answer must be obvious: To permit Congress to convert the undifferentiated public interest in executive officers'· compliance with the law into an "individual right" vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to "take Care that the Laws be faithfully executed," Art. II, § 3. It would enable the courts, with the permission of Congress, "to assume a position of authority over the governmental acts of another and co-equal department," *Massachusetts* v. *Mellon*, 262 U. S., at 489, and to become " 'virtually continuing monitors of the wisdom and soundness of Executive action.' " *Allen, supra*, at 760 (quoting *Laird* v. *Tatum*, 408 U. S. 1, 15 (1972)). We have always rejected that vision of our role:

> "When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. This permits the courts to participate in law enforcement entrusted to administrative bodies only to the extent necessary to protect justiciable individual rights against administrative action fairly beyond the granted powers. . . . This is very far from assuming that the courts are charged more than administrators or legislators with the protection of the rights of the people. Congress and the Executive supervise the acts of administrative agents. . . . But under Article III, Congress established courts to adjudicate cases and controversies as to claims of infringement of individual rights whether by unlawful action of private persons or by the exertion of unauthorized administrative power." *Stark* v. *Wickard*, 321 U. S. 288, 309–310 (1944) (footnote omitted).

"Individual rights," within the meaning of this passage, do not mean public rights that have been legislatively pronounced to belong to each individual who forms part of the public. See also *Sierra Club*, 405 U. S., at 740–741, n. 16.

Nothing in this contradicts the principle that "[t]he . . . injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Warth*, 422 U. S., at 500 (quoting *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 617, n. 3 (1973)). Both of the cases used by *Linda R. S.* as an illustration of that principle involved Congress' elevating to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law (namely, injury to an individual's personal interest in living in a racially integrated community, see *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205, 208–212 (1972), and injury to a company's interest in marketing its product free from competition, see *Hardin* v. *Kentucky Utilities Co.*, 390 U. S. 1, 6 (1968)). As we said in *Sierra Club*, "[Statutory] broadening [of] the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." 405 U. S., at 738. Whether or not the principle set forth in *Warth* can be extended beyond that distinction, it is clear that in suits against the Government, at least, the concrete injury requirement must remain.

\*     \*     \*

We hold that respondents lack standing to bring this action and that the Court of Appeals erred in denying the summary judgment motion filed by the United States. The opinion of the Court of Appeals is hereby reversed, and the cause is remanded for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, with whom JUSTICE SOUTER joins, concurring in part and concurring in the judgment.

Although I agree with the essential parts of the Court's analysis, I write separately to make several observations.

I agree with the Court's conclusion in Part III–A that, on the record before us, respondents have failed to demonstrate that they themselves are "among the injured." *Sierra Club* v. *Morton*, 405 U. S. 727, 735 (1972). This component of the standing inquiry is not satisfied unless

> "[p]laintiffs . . . demonstrate a 'personal stake in the outcome.' . . . Abstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Los Angeles* v. *Lyons*, 461 U. S. 95, 101–102 (1983) (citations omitted).

While it may seem trivial to require that Mses. Kelly and Skilbred acquire airline tickets to the project sites or announce a date certain upon which they will return, see *ante*, at 564, this is not a case where it is reasonable to assume that the affiants will be using the sites on a regular basis, see *Sierra Club* v. *Morton, supra*, at 735, n. 8, nor do the affiants claim to have visited the sites since the projects commenced. With respect to the Court's discussion of respondents' "ecosystem nexus," "animal nexus," and "vocational nexus" theories, *ante*, at 565–567, I agree that on this record respondents' showing is insufficient to establish standing on any of these bases. I am not willing to foreclose the possibility, however, that in different circumstances a nexus theory similar to those proffered here might support a claim to standing. See *Japan Whaling Assn.* v. *American Cetacean Society*, 478 U. S. 221, 231, n. 4 (1986) ("[R]espondents . . . undoubtedly have alleged a sufficient 'injury in fact' in that

the whale watching and studying of their members will be adversely affected by continued whale harvesting").

In light of the conclusion that respondents have not demonstrated a concrete injury here sufficient to support standing under our precedents, I would not reach the issue of redressability that is discussed by the plurality in Part III–B.

I also join Part IV of the Court's opinion with the following observations. As Government programs and policies become more complex and far reaching, we must be sensitive to the articulation of new rights of action that do not have clear analogs in our common-law tradition. Modern litigation has progressed far from the paradigm of Marbury suing Madison to get his commission, *Marbury* v. *Madison,* 1 Cranch 137 (1803), or Ogden seeking an injunction to halt Gibbons' steamboat operations, *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824). In my view, Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before, and I do not read the Court's opinion to suggest a contrary view. See *Warth* v. *Seldin,* 422 U. S. 490, 500 (1975); *ante,* at 578. In exercising this power, however, Congress must at the very least identify the injury it seeks to vindicate and relate the injury to the class of persons entitled to bring suit. The citizen-suit provision of the Endangered Species Act does not meet these minimal requirements, because while the statute purports to confer a right on "any person . . . to enjoin . . . the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter," it does not of its own force establish that there is an injury in "any person" by virtue of any "violation." 16 U. S. C. § 1540(g)(1)(A).

The Court's holding that there is an outer limit to the power of Congress to confer rights of action is a direct and necessary consequence of the case and controversy limitations found in Article III. I agree that it would exceed those limitations if, at the behest of Congress and in the ab-

sence of any showing of concrete injury, we were to entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws. While it does not matter how many persons have been injured by the challenged action, the party bringing suit must show that the action injures him in a concrete and personal way. This requirement is not just an empty formality. It preserves the vitality of the adversarial process by assuring both that the parties before the court have an actual, as opposed to professed, stake in the outcome, and that "the legal questions presented . . . will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College* v. *Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 472 (1982). In addition, the requirement of concrete injury confines the Judicial Branch to its proper, limited role in the constitutional framework of Government.

An independent judiciary is held to account through its open proceedings and its reasoned judgments. In this process it is essential for the public to know what persons or groups are invoking the judicial power, the reasons that they have brought suit, and whether their claims are vindicated or denied. The concrete injury requirement helps assure that there can be an answer to these questions; and, as the Court's opinion is careful to show, that is part of the constitutional design.

With these observations, I concur in Parts I, II, III–A, and IV of the Court's opinion and in the judgment of the Court.

JUSTICE STEVENS, concurring in the judgment.

Because I am not persuaded that Congress intended the consultation requirement in § 7(a)(2) of the Endangered Species Act of 1973 (ESA), 16 U. S. C. § 1536(a)(2), to apply to activities in foreign countries, I concur in the judgment of reversal. I do not, however, agree with the Court's conclu-

sion that respondents lack standing because the threatened injury to their interest in protecting the environment and studying endangered species is not "imminent." Nor do I agree with the plurality's additional conclusion that respondents' injury is not "redressable" in this litigation.

## I

In my opinion a person who has visited the critical habitat of an endangered species has a professional interest in preserving the species and its habitat, and intends to revisit them in the future has standing to challenge agency action that threatens their destruction. Congress has found that a wide variety of endangered species of fish, wildlife, and plants are of "aesthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U. S. C. § 1531(a)(3). Given that finding, we have no license to demean the importance of the interest that particular individuals may have in observing any species or its habitat, whether those individuals are motivated by esthetic enjoyment, an interest in professional research, or an economic interest in preservation of the species. Indeed, this Court has often held that injuries to such interests are sufficient to confer standing,[1] and the Court reiterates that holding today. See *ante*, at 562–563.

The Court nevertheless concludes that respondents have not suffered "injury in fact" because they have not shown that the harm to the endangered species will produce "imminent" injury to them. See *ante*, at 564. I disagree. An injury to an individual's interest in studying or enjoying a species and its natural habitat occurs when someone (whether it be the Government or a private party) takes action that harms that species and habitat. In my judgment,

---

[1] See, *e. g., Sierra Club* v. *Morton*, 405 U. S. 727, 734 (1972); *United States* v. *Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U. S. 669, 686–687 (1973); *Japan Whaling Assn.* v. *American Cetacean Society*, 478 U. S. 221, 230–231, n. 4 (1986).

therefore, the "imminence" of such an injury should be measured by the timing and likelihood of the threatened environmental harm, rather than—as the Court seems to suggest, *ante*, at 564, and n. 2—by the time that might elapse between the present and the time when the individuals would visit the area if no such injury should occur.

To understand why this approach is correct and consistent with our precedent, it is necessary to consider the purpose of the standing doctrine. Concerned about "the proper—and properly limited—role of the courts in a democratic society," we have long held that "Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party." *Warth* v. *Seldin*, 422 U. S. 490, 498–499 (1975). The plaintiff must have a "personal stake in the outcome" sufficient to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *Baker* v. *Carr*, 369 U. S. 186, 204 (1962). For that reason, "[a]bstract injury is not enough. It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct. . . . The injury or threat of injury must be both 'real and immediate,' not 'conjectural,' or 'hypothetical.'" *O'Shea* v. *Littleton*, 414 U. S. 488, 494 (1974) (quoting *Golden* v. *Zwickler*, 394 U. S. 103, 109–110 (1969)).

Consequently, we have denied standing to plaintiffs whose likelihood of suffering any concrete adverse effect from the challenged action was speculative. See, *e. g.*, *Whitmore* v. *Arkansas*, 495 U. S. 149, 158–159 (1990); *Los Angeles* v. *Lyons*, 461 U. S. 95, 105 (1983); *O'Shea*, 414 U. S., at 497. In this case, however, the likelihood that respondents will be injured by the destruction of the endangered species is not speculative. If respondents are genuinely interested in the preservation of the endangered species and intend to study or observe these animals in the future, their injury will occur as soon as the animals are destroyed. Thus the only poten-

tial source of "speculation" in this case is whether respondents' intent to study or observe the animals is genuine.[2] In my view, Joyce Kelly and Amy Skilbred have introduced sufficient evidence to negate petitioner's contention that their claims of injury are "speculative" or "conjectural." As JUSTICE BLACKMUN explains, *post*, at 591–592, a reasonable finder of fact could conclude, from their past visits, their professional backgrounds, and their affidavits and deposition testimony, that Ms. Kelly and Ms. Skilbred will return to the project sites and, consequently, will be injured by the destruction of the endangered species and critical habitat.

The plurality also concludes that respondents' injuries are not redressable in this litigation for two reasons. First, respondents have sought only a declaratory judgment that the Secretary of the Interior's regulation interpreting § 7(a)(2) to require consultation only for agency actions in the United States or on the high seas is invalid and an injunction requiring him to promulgate a new regulation requiring consultation for agency actions abroad as well. But, the plurality opines, even if respondents succeed and a new regulation is

---

[2] As we recognized in *Sierra Club* v. *Morton,* 405 U. S., at 735, the impact of changes in the esthetics or ecology of a particular area does "not fall indiscriminately upon every citizen. The alleged injury will be felt directly only by those who use [the area,] and for whom the aesthetic and recreational values of the area will be lessened . . . ." Thus, respondents would not be injured by the challenged projects if they had not visited the sites or studied the threatened species and habitat. But, as discussed above, respondents did visit the sites; moreover, they have expressed an intent to do so again. This intent to revisit the area is significant evidence tending to confirm the genuine character of respondents' interest, but I am not at all sure that an intent to revisit would be indispensable in every case. The interest that confers standing in a case of this kind is comparable, though by no means equivalent, to the interest in a relationship among family members that can be immediately harmed by the death of an absent member, regardless of when, if ever, a family reunion is planned to occur. Thus, if the facts of this case had shown repeated and regular visits by the respondents, cf. *ante,* at 579 (opinion of KENNEDY, J.), proof of an intent to revisit might well be superfluous.

promulgated, there is no guarantee that federal agencies that are not parties to this case will actually consult with the Secretary. See *ante*, at 568–571. Furthermore, the plurality continues, respondents have not demonstrated that federal agencies can influence the behavior of the foreign governments where the affected projects are located. Thus, even if the agencies consult with the Secretary and terminate funding for foreign projects, the foreign governments might nonetheless pursue the projects and jeopardize the endangered species. See *ante*, at 571. Neither of these reasons is persuasive.

We must presume that if this Court holds that § 7(a)(2) requires consultation, all affected agencies would abide by that interpretation and engage in the requisite consultations. Certainly the Executive Branch cannot be heard to argue that an authoritative construction of the governing statute by this Court may simply be ignored by any agency head. Moreover, if Congress has required consultation between agencies, we must presume that such consultation will have a serious purpose that is likely to produce tangible results. As JUSTICE BLACKMUN explains, *post*, at 599–601, it is not mere speculation to think that foreign governments, when faced with the threatened withdrawal of United States assistance, will modify their projects to mitigate the harm to endangered species.

## II

Although I believe that respondents have standing, I nevertheless concur in the judgment of reversal because I am persuaded that the Government is correct in its submission that § 7(a)(2) does not apply to activities in foreign countries. As with all questions of statutory construction, the question whether a statute applies extraterritorially is one of congressional intent. *Foley Bros., Inc.* v. *Filardo*, 336 U. S. 281, 284–285 (1949). We normally assume that "Congress is primarily concerned with domestic conditions," *id.*, at 285, and therefore presume that "'legislation of Congress, unless a

contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States,'" *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248 (1991) (quoting *Foley Bros.*, 336 U. S., at 285).

Section 7(a)(2) provides, in relevant part:

> "Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior or Commerce, as appropriate[3]], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. . . ." 16 U. S. C. § 1536(a)(2).

Nothing in this text indicates that the section applies in foreign countries.[4] Indeed, the only geographic reference in

---

[3] The ESA defines "Secretary" to mean "the Secretary of the Interior or the Secretary of Commerce as program responsibilities are vested pursuant to the provisions of Reorganization Plan Numbered 4 of 1970." 16 U. S. C. § 1532(15). As a general matter, "marine species are under the jurisdiction of the Secretary of Commerce and all other species are under the jurisdiction of the Secretary of the Interior." 51 Fed. Reg. 19926 (1986) (preamble to final regulations governing interagency consultation promulgated by the Fish and Wildlife Service and the National Marine Fisheries Service on behalf of the Secretary of the Interior and the Secretary of Commerce).

[4] Respondents point out that the duties in § 7(a)(2) are phrased in broad, inclusive language: "Each Federal agency" shall consult with the Secretary and ensure that "any action" does not jeopardize "any endangered or threatened species" or destroy or adversely modify the "habitat of such species." See Brief for Respondents 36; 16 U. S. C. § 1536(a)(2). The Court of Appeals correctly recognized, however, that such inclusive language, by itself, is not sufficient to overcome the presumption against the

the section is in the "critical habitat" clause,[5] which mentions "affected States." The Secretary of the Interior and the Secretary of Commerce have consistently taken the position that they need not designate critical habitat in foreign countries. See 42 Fed. Reg. 4869 (1977) (initial regulations of the Fish and Wildlife Service and the National Marine Fisheries Service on behalf of the Secretary of the Interior and the Secretary of Commerce). Consequently, neither Secretary interprets § 7(a)(2) to require federal agencies to engage in consultations to ensure that their actions in foreign countries will not adversely affect the critical habitat of endangered or threatened species.

That interpretation is sound, and, in fact, the Court of Appeals did not question it.[6] There is, moreover, no indication that Congress intended to give a different geographic scope to the two clauses in § 7(a)(2). To the contrary, Congress recognized that one of the "major causes" of extinction of

---

extraterritorial application of statutes. 911 F. 2d 117, 122 (CA8 1990); see also *Foley Bros., Inc.* v. *Filardo,* 336 U. S. 281, 282, 287–288 (1949) (statute requiring an 8-hour day provision in "'[e]very contract made to which the United States . . . is a party'" is inapplicable to contracts for work performed in foreign countries).

[5] Section 7(a)(2) has two clauses which require federal agencies to consult with the Secretary to ensure that their actions (1) do not jeopardize threatened or endangered species (the "endangered species clause"), and (2) are not likely to destroy or adversely affect the habitat of such species (the "critical habitat clause").

[6] Instead, the Court of Appeals concluded that the endangered species clause and the critical habitat clause are "severable," at least with respect to their "geographical scope," so that the former clause applies extraterritorially even if the latter does not. 911 F. 2d, at 125. Under this interpretation, federal agencies must consult with the Secretary to ensure that their actions in foreign countries are not likely to threaten any endangered species, but they need not consult to ensure that their actions are not likely to destroy the critical habitats of these species. I cannot subscribe to the Court of Appeals' strained interpretation, for there is no indication that Congress intended to give such vastly different scope to the two clauses in § 7(a)(2).

endangered species is the "destruction of natural habitat." S. Rep. No. 93–307, p. 2 (1973); see also H. Rep. No. 93–412, p. 2 (1973); *TVA* v. *Hill*, 437 U. S. 153, 179 (1978). It would thus be illogical to conclude that Congress required federal agencies to avoid jeopardy to endangered species abroad, but not destruction of critical habitat abroad.

The lack of an express indication that the consultation requirement applies extraterritorially is particularly significant because other sections of the ESA expressly deal with the problem of protecting endangered species abroad. Section 8, for example, authorizes the President to provide assistance to "any foreign country (with its consent) . . . in the development and management of programs in that country which [are] . . . necessary or useful for the conservation of any endangered species or threatened species listed by the Secretary pursuant to section 1533 of this title." 16 U. S. C. § 1537(a). It also directs the Secretary of the Interior, "through the Secretary of State," to "encourage" foreign countries to conserve fish and wildlife and to enter into bilateral or multilateral agreements. § 1537(b). Section 9 makes it unlawful to import endangered species into (or export them from) the United States or to otherwise traffic in endangered species "in interstate or foreign commerce." §§ 1538(a)(1)(A), (E), (F). Congress thus obviously thought about endangered species abroad and devised specific sections of the ESA to protect them. In this context, the absence of any explicit statement that the consultation requirement is applicable to agency actions in foreign countries suggests that Congress did not intend that § 7(a)(2) apply extraterritorially.

Finally, the general purpose of the ESA does not evince a congressional intent that the consultation requirement be applicable to federal agency actions abroad. The congressional findings explaining the need for the ESA emphasize that "various species of fish, wildlife, and plants *in the United States* have been rendered extinct as a consequence

of economic growth and development untempered by adequate concern and conservation," and that these species "are of aesthetic, ecological, educational, historical, recreational, and scientific value to the *Nation and its people.*" §§ 1531(1), (3) (emphasis added). The lack of similar findings about the harm caused by development in other countries suggests that Congress was primarily concerned with balancing development and conservation goals in this country.[7]

In short, a reading of the entire statute persuades me that Congress did not intend the consultation requirement in § 7(a)(2) to apply to activities in foreign countries. Accordingly, notwithstanding my disagreement with the Court's disposition of the standing question, I concur in its judgment.

JUSTICE BLACKMUN, with whom JUSTICE O'CONNOR joins, dissenting.

I part company with the Court in this case in two respects. First, I believe that respondents have raised genuine issues of fact—sufficient to survive summary judgment—both as to injury and as to redressability. Second, I question the Court's breadth of language in rejecting standing for "procedural" injuries. I fear the Court seeks to impose fresh limitations on the constitutional authority of Congress to allow

---

[7] Of course, Congress also found that "the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to [several international agreements]," and that "encouraging the States . . . to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments . . . ." 16 U. S. C. §§ 1531(4), (5). The Court of Appeals read these findings as indicative of a congressional intent to make § 7(a)(2)'s consultation requirement applicable to agency action abroad. See 911 F. 2d, at 122–123. I am not persuaded, however, that such a broad congressional intent can be gleaned from these findings. Instead, I think the findings indicate a more narrow congressional intent that the United States abide by its international commitments.

citizen suits in the federal courts for injuries deemed "procedural" in nature. I dissent.

## I

Article III of the Constitution confines the federal courts to adjudication of actual "Cases" and "Controversies." To ensure the presence of a "case" or "controversy," this Court has held that Article III requires, as an irreducible minimum, that a plaintiff allege (1) an injury that is (2) "fairly traceable to the defendant's allegedly unlawful conduct" and that is (3) "likely to be redressed by the requested relief." *Allen* v. *Wright*, 468 U. S. 737, 751 (1984).

## A

To survive petitioner's motion for summary judgment on standing, respondents need not prove that they are actually or imminently harmed. They need show only a "genuine issue" of material fact as to standing. Fed. Rule Civ. Proc. 56(c). This is not a heavy burden. A "genuine issue" exists so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party [respondents]." *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 248 (1986). This Court's "function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*, at 249.

The Court never mentions the "genuine issue" standard. Rather, the Court refers to the type of evidence it feels respondents failed to produce, namely, "affidavits or other evidence showing, through specific facts" the existence of injury. *Ante*, at 563. The Court thereby confuses respondents' evidentiary burden (i. e., affidavits asserting "specific facts") in withstanding a summary judgment motion under Rule 56(e) with the standard of proof (i. e., the existence of a "genuine issue" of "material fact") under Rule 56(c).

1

Were the Court to apply the proper standard for summary judgment, I believe it would conclude that the sworn affidavits and deposition testimony of Joyce Kelly and Amy Skilbred advance sufficient facts to create a genuine issue for trial concerning whether one or both would be imminently harmed by the Aswan and Mahaweli projects. In the first instance, as the Court itself concedes, the affidavits contained facts making it at least "questionable" (and therefore within the province of the factfinder) that certain agency-funded projects threaten listed species.[1] *Ante*, at 564. The only remaining issue, then, is whether Kelly and Skilbred have shown that they personally would suffer imminent harm.

I think a reasonable finder of fact could conclude from the information in the affidavits and deposition testimony that either Kelly or Skilbred will soon return to the project sites, thereby satisfying the "actual or imminent" injury standard. The Court dismisses Kelly's and Skilbred's general state-

---

[1] The record is replete with genuine issues of fact about the harm to endangered species from the Aswan and Mahaweli projects. For example, according to an internal memorandum of the Fish and Wildlife Service, no fewer than eight listed species are found in the Mahaweli project area (Indian elephant, leopard, purple-faced langur, toque macaque, red face malkoha, Bengal monitor, mugger crocodile, and python). App. 78. The memorandum recounts that the Sri Lankan Government has specifically requested assistance from the Agency for International Development (AID) in "mitigating the negative impacts to the wildlife involved." *Ibid.* In addition, a letter from the Director of the Fish and Wildlife Service to AID warns: "The magnitude of the Accelerated Mahaweli Development Program could have massive environmental impacts on such an insular ecosystem as the Mahaweli River system." *Id.,* at 215. It adds: "The Sri Lankan government lacks the necessary finances to undertake any long-term management programs to avoid the negative impacts to the wildlife." *Id.,* at 216. Finally, in an affidavit submitted by petitioner for purposes of this litigation, an AID official states that an AID environmental assessment "showed that the [Mahaweli] project could affect several endangered species." *Id.,* at 159.

ments that they intended to revisit the project sites as "simply not enough." *Ibid.* But those statements did not stand alone. A reasonable finder of fact could conclude, based not only upon their statements of intent to return, but upon their past visits to the project sites, as well as their professional backgrounds, that it was likely that Kelly and Skilbred would make a return trip to the project areas. Contrary to the Court's contention that Kelly's and Skilbred's past visits "prov[e] nothing," *ibid.*, the fact of their past visits could demonstrate to a reasonable factfinder that Kelly and Skilbred have the requisite resources and personal interest in the preservation of the species endangered by the Aswan and Mahaweli projects to make good on their intention to return again. Cf. *Los Angeles* v. *Lyons*, 461 U. S. 95, 102 (1983) ("Past wrongs were evidence bearing on whether there is a real and immediate threat of repeated injury") (internal quotation marks omitted). Similarly, Kelly's and Skilbred's professional backgrounds in wildlife preservation, see App. 100, 144, 309–310, also make it likely—at least far more likely than for the average citizen—that they would choose to visit these areas of the world where species are vanishing.

By requiring a "description of concrete plans" or "specification of *when* the some day [for a return visit] will be," *ante*, at 564, the Court, in my view, demands what is likely an empty formality. No substantial barriers prevent Kelly or Skilbred from simply purchasing plane tickets to return to the Aswan and Mahaweli projects. This case differs from other cases in which the imminence of harm turned largely on the affirmative actions of third parties beyond a plaintiff's control. See *Whitmore* v. *Arkansas*, 495 U. S. 149, 155–156 (1990) (harm to plaintiff death-row inmate from fellow inmate's execution depended on the court's one day reversing plaintiff's conviction or sentence and considering comparable sentences at resentencing); *Los Angeles* v. *Lyons*, 461 U. S., at 105 (harm dependent on police's arresting plaintiff again

and subjecting him to chokehold); *Rizzo* v. *Goode*, 423 U. S. 362, 372 (1976) (harm rested upon "what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception of departmental disciplinary procedures"); *O'Shea* v. *Littleton*, 414 U. S. 488, 495–498 (1974) (harm from discriminatory conduct of county magistrate and judge dependent on plaintiffs' being arrested, tried, convicted, and sentenced); *Golden* v. *Zwickler*, 394 U. S. 103, 109 (1969) (harm to plaintiff dependent on a former Congressman's (then serving a 14-year term as a judge) running again for Congress). To be sure, a plaintiff's unilateral control over his or her exposure to harm does not *necessarily* render the harm nonspeculative. Nevertheless, it suggests that a finder of fact would be far more likely to conclude the harm is actual or imminent, especially if given an opportunity to hear testimony and determine credibility.

I fear the Court's demand for detailed descriptions of future conduct will do little to weed out those who are genuinely harmed from those who are not. More likely, it will resurrect a code-pleading formalism in federal court summary judgment practice, as federal courts, newly doubting their jurisdiction, will demand more and more particularized showings of future harm. Just to survive summary judgment, for example, a property owner claiming a decline in the value of his property from governmental action might have to specify the exact date he intends to sell his property and show that there is a market for the property, lest it be surmised he might not sell again. A nurse turned down for a job on grounds of her race had better be prepared to show on what date she was prepared to start work, that she had arranged daycare for her child, and that she would not have accepted work at another hospital instead. And a Federal Tort Claims Act plaintiff alleging loss of consortium should make sure to furnish this Court with a "description of concrete plans" for her nightly schedule of attempted activities.

## 2

The Court also concludes that injury is lacking, because respondents' allegations of "ecosystem nexus" failed to demonstrate sufficient proximity to the site of the environmental harm. *Ante,* at 565–566. To support that conclusion, the Court mischaracterizes our decision in *Lujan* v. *National Wildlife Federation,* 497 U. S. 871 (1990), as establishing a general rule that "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity." *Ante,* at 565–566. In *National Wildlife Federation,* the Court required specific geographical proximity because of the particular type of harm alleged in that case: harm to the plaintiff's visual enjoyment of nature from mining activities. 497 U. S., at 888. One cannot suffer from the sight of a ruined landscape without being close enough to see the sites actually being mined. Many environmental injuries, however, cause harm distant from the area immediately affected by the challenged action. Environmental destruction may affect animals traveling over vast geographical ranges, see, *e. g., Japan Whaling Assn.* v. *American Cetacean Society,* 478 U. S. 221 (1986) (harm to American whale watchers from Japanese whaling activities), or rivers running long geographical courses, see, *e. g., Arkansas* v. *Oklahoma,* 503 U. S. 91 (1992) (harm to Oklahoma residents from wastewater treatment plant 39 miles from border). It cannot seriously be contended that a litigant's failure to use the precise or exact site where animals are slaughtered or where toxic waste is dumped into a river means he or she cannot show injury.

The Court also rejects respondents' claim of vocational or professional injury. The Court says that it is "beyond all reason" that a zoo "keeper" of Asian elephants would have standing to contest his Government's participation in the eradication of all the Asian elephants in another part of the world. *Ante,* at 566. I am unable to see how the distant location of the destruction *necessarily* (for purposes of ruling

at summary judgment) mitigates the harm to the elephant keeper. If there is no more access to a future supply of the animal that sustains a keeper's livelihood, surely there is harm.

I have difficulty imagining this Court applying its rigid principles of geographic formalism anywhere outside the context of environmental claims. As I understand it, environmental plaintiffs are under no special constitutional standing disabilities. Like other plaintiffs, they need show only that the action they challenge has injured them, without necessarily showing they happened to be physically near the location of the alleged wrong. The Court's decision today should not be interpreted "to foreclose the possibility . . . that in different circumstances a nexus theory similar to those proffered here might support a claim to standing." *Ante*, at 579 (KENNEDY, J., concurring in part and concurring in judgment).

## B

A plurality of the Court suggests that respondents have not demonstrated redressability: a likelihood that a court ruling in their favor would remedy their injury. *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 74–75, and n. 20 (1978) (plaintiff must show "substantial likelihood" that relief requested will redress the injury). The plurality identifies two obstacles. The first is that the "action agencies" (*e. g.*, AID) cannot be required to undertake consultation with petitioner Secretary, because they are not directly bound as parties to the suit and are otherwise not indirectly bound by being subject to petitioner Secretary's regulation. Petitioner, however, officially and publicly has taken the position that his regulations regarding consultation under § 7 of the Act are binding on action agencies. 50 CFR § 402.14(a) (1991).[2] And he has previously

---

[2] This section provides in part:

"(a) *Requirement for formal consultation.* Each Federal agency shall review its actions at the earliest possible time to determine whether any

taken the same position in this very litigation, having stated in his answer to the complaint that petitioner "admits the Fish and Wildlife Service (FWS) was designated the lead agency for the formulation of regulations concerning section 7 of the [Endangered Species Act]." App. 246. I cannot agree with the plurality that the Secretary (or the Solicitor General) is now free, for the convenience of this appeal, to disavow his prior public and litigation positions. More generally, I cannot agree that the Government is free to play "Three-Card Monte" with its description of agencies' authority to defeat standing against the agency given the lead in administering a statutory scheme.

Emphasizing that none of the action agencies are parties to this suit (and having rejected the possibility of their being indirectly bound by petitioner's regulation), the plurality concludes that "there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Ante*, at 569. I am not as willing as the plurality is to assume that agencies at least will not try to follow the law. Moreover, I wonder if the plurality has not overlooked the extensive involvement from the inception of this litigation by the Department of State and AID.[3] Under

---

action may affect listed species or critical habitat. If such a determination is made, formal consultation is required . . . ."

The Secretary's intent to make the regulations binding upon other agencies is even clearer from the discussion accompanying promulgation of the consultation rules. See 51 Fed. Reg. 19928 (1986) ("Several commenters stated that Congress did not intend that the Service interpret or implement section 7, and believed that the Service should recast the regulations as 'nonbinding guidelines' that would govern only the Service's role in consultation . . . . The Service is satisfied that it has ample authority and legislative mandate to issue this rule, and believes that uniform consultation standards and procedures are necessary to meet its obligations under section 7").

[3] For example, petitioner's motion before the District Court to dismiss the complaint identified four attorneys from the Department of State and AID (an agency of the Department of State) as "counsel" to the attorneys from the Justice Department in this action. One AID lawyer actually

principles of collateral estoppel, these agencies are precluded from subsequently relitigating the issues decided in this suit.

> "[O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own, and who does this openly to the knowledge of the opposing party, is as much bound by the judgment and as fully entitled to avail himself of it as an estoppel against an adverse party, as he would be if he had been a party to the record." *Souffront* v. *Compagnie des Sucreries de Porto Rico*, 217 U. S. 475, 487 (1910).

This principle applies even to the Federal Government. In *Montana* v. *United States*, 440 U. S. 147 (1979), this Court held that the Government was estopped from relitigating in federal court the constitutionality of Montana's gross receipts tax, because that issue previously had been litigated in state court by an individual contractor whose litigation had been financed and controlled by the Federal Government. "Thus, although not a party, the United States plainly had a sufficient 'laboring oar' in the conduct of the state-court litigation to actuate principles of estoppel." *Id.,* at 155. See also *United States* v. *Mendoza,* 464 U. S. 154, 164, n. 9 (1984) (Federal Government estopped where it "constituted a 'party' in all but a technical sense"). In my view, the action agencies have had sufficient "laboring oars" in this litigation since its inception to be bound from subsequent

---

entered a formal appearance before the District Court on behalf of AID. On at least one occasion petitioner requested an extension of time to file a brief, representing that " '[a]n extension is necessary for the Department of Justice to consult with . . . the Department of State [on] the brief.' " See Brief for Respondents 31, n. 8. In addition, AID officials have offered testimony in this action.

relitigation of the extraterritorial scope of the § 7 consultation requirement.[4]   As a result, I believe respondents' injury would likely be redressed by a favorable decision.

[4] The plurality now suggests that collateral-estoppel principles can have no application here, because the participation of other agencies in this litigation arose *after* its inception.  Borrowing a principle from this Court's statutory diversity jurisdiction cases and transferring it to the constitutional standing context, the Court observes: " 'The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*' "  *Ante*, at 569, n. 4 (quoting *Newman-Green, Inc.* v. *Alfonzo-Larrain*, 490 U. S. 826, 830 (1989)).  See also *Mollan* v. *Torrance*, 9 Wheat. 537, 539 (1824) (Marshall, C. J.).  The plurality proclaims that "[i]t cannot be" that later participation of other agencies in this suit retroactively created a jurisdictional issue that did not exist at the outset. *Ante*, at 570, n. 4.

The plurality, however, overlooks at least three difficulties with this explanation.  In the first place, assuming that the plurality were correct that events as of the initiation of the lawsuit are the only proper jurisdictional reference point, were the Court to follow this rule in this case there would be no question as to the compliance of other agencies, because, as stated at an earlier point in the opinion: "When the Secretary promulgated the regulation at issue here, he thought it was binding on the agencies." *Ante*, at 569.  · This suit was commenced in October 1986, just three months after the regulation took effect.  App. 21; 51 Fed. Reg. 19926 (1986).  As the plurality further admits, questions about compliance of other agencies with the Secretary's regulation arose only by later participation of the Solicitor General and other agencies in the suit.  *Ante*, at 569.  Thus, it was, to borrow the plurality's own words, "assuredly not true when this suit was filed, naming the Secretary alone," *ante*, at 569, n. 4, that there was any question before the District Court about other agencies being bound.

Second, were the plurality correct that, for purposes of determining redressability, a court may look only to facts as they exist when the complaint is filed, then the Court by implication would render a nullity part of Rule 19 of the Federal Rules of Civil Procedure.  Rule 19 provides in part for the joinder of persons if "in the person's absence complete relief cannot be accorded among those already parties."  This presupposes nonredressability at the outset of the litigation.  Under the plurality's rationale, a district court would have no authority to join indispensable parties, because it would, as an initial matter, have no jurisdiction for lack of the power to provide redress at the outset of the litigation.

Third, the rule articulated in *Newman-Green* is that the existence of federal jurisdiction *"ordinarily"* depends on the facts at the initiation of

The second redressability obstacle relied on by the plurality is that "the [action] agencies generally supply only a fraction of the funding for a foreign project." *Ante,* at 571. What this Court might "generally" take to be true does not eliminate the existence of a genuine issue of fact to withstand summary judgment. Even if the action agencies supply only a fraction of the funding for a particular foreign project, it remains at least a question for the finder of fact whether threatened withdrawal of that fraction would affect foreign government conduct sufficiently to avoid harm to listed species.

The plurality states that "AID, for example, has provided less than 10% of the funding for the Mahaweli project." *Ibid.* The plurality neglects to mention that this "fraction" amounts to $170 million, see App. 159, not so paltry a sum for a country of only 16 million people with a gross national product of less than $6 billion in 1986 when respondents filed

---

the lawsuit. This is no ironclad *per se* rule without exceptions. Had the Solicitor General, for example, taken a position during this appeal that the § 7 consultation requirement does in fact apply extraterritorially, the controversy would be moot, and this Court would be without jurisdiction.

In the plurality's view, federal subject-matter jurisdiction appears to be a one-way street running the Executive Branch's way. When the Executive Branch wants to dispel jurisdiction over an action against an agency, it is free to raise at any point in the litigation that other nonparty agencies might not be bound by any determinations of the one agency defendant. When a plaintiff, however, seeks to preserve jurisdiction in the face of a claim of nonredressability, the plaintiff is not free to point to the involvement of nonparty agencies in subsequent parts of the litigation. The plurality does not explain why the street runs only one way—why some actions of the Executive Branch subsequent to initiation of a lawsuit are cognizable for jurisdictional purposes but others simply are not.

More troubling still is the distance this one-way street carries the plurality from the underlying purpose of the standing doctrine. The purpose of the standing doctrine is to ensure that courts do not render advisory opinions rather than resolve genuine controversies between adverse parties. Under the plurality's analysis, the federal courts are to ignore their *present* ability to resolve a concrete controversy if at some distant point in the past it could be said that redress could not have been provided. The plurality perverts the standing inquiry.

the complaint in this action. Federal Research Division, Library of Congress, Sri Lanka: A Country Study (Area Handbook Series) xvi–xvii (1990).

The plurality flatly states: "Respondents have produced nothing to indicate that the projects they have named will . . . do less harm to listed species, if that fraction is eliminated." *Ante*, at 571. As an initial matter, the relevant inquiry is not, as the plurality suggests, what will happen if AID or other agencies stop funding projects, but what will happen if AID or other agencies comply with the consultation requirement for projects abroad. Respondents filed suit to require consultation, not a termination of funding. Respondents have raised at least a genuine issue of fact that the projects harm endangered species and that the actions of AID and other United States agencies can mitigate that harm.

The plurality overlooks an Interior Department memorandum listing eight endangered or threatened species in the Mahaweli project area and recounting that "[t]he Sri Lankan government has requested the assistance of AID in mitigating the negative impacts to the wildlife involved." App. 78. Further, a letter from the Director of the Fish and Wildlife Service to AID states:

> "The Sri Lankan government lacks the necessary finances to undertake any long-term management programs to avoid the negative impacts to the wildlife. The donor nations and agencies that are financing the [Mahaweli project] will be the key as to how successfully the wildlife is preserved. If wildlife problems receive the same level of attention as the engineering project, then the negative impacts to the environment can be alleviated. This means that there has to be long-term funding in sufficient amounts to stem the negative impacts of this project." *Id.*, at 216.

I do not share the plurality's astonishing confidence that, on the record here, a factfinder could only conclude that AID was powerless to ensure the protection of listed species at the Mahaweli project.

As for the Aswan project, the record again rebuts the plurality's assumption that donor agencies are without any authority to protect listed species. Kelly asserted in her affidavit—and it has not been disputed—that the Bureau of Reclamation was "overseeing" the rehabilitation of the Aswan project. *Id.*, at 101. See also *id.*, at 65 (Bureau of Reclamation publication stating: "In 1982, the Egyptian government . . . requested that Reclamation serve as its engineering advisor for the nine-year [Aswan] rehabilitation project").

I find myself unable to agree with the plurality's analysis of redressability, based as it is on its invitation of executive lawlessness, ignorance of principles of collateral estoppel, unfounded assumptions about causation, and erroneous conclusions about what the record does not say. In my view, respondents have satisfactorily shown a genuine issue of fact as to whether their injury would likely be redressed by a decision in their favor.

## II

The Court concludes that any "procedural injury" suffered by respondents is insufficient to confer standing. It rejects the view that the "injury-in-fact requirement [is] satisfied by congressional conferral upon *all* persons of an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law." *Ante,* at 573. Whatever the Court might mean with that very broad language, it cannot be saying that "procedural injuries" *as a class* are necessarily insufficient for purposes of Article III standing.

Most governmental conduct can be classified as "procedural." Many injuries caused by governmental conduct, therefore, are categorizable at some level of generality as

"procedural" injuries. Yet, these injuries are not categorically beyond the pale of redress by the federal courts. When the Government, for example, "procedurally" issues a pollution permit, those affected by the permittee's pollutants are not without standing to sue. Only later cases will tell just what the Court means by its intimation that "procedural" injuries are not constitutionally cognizable injuries. In the meantime, I have the greatest of sympathy for the courts across the country that will struggle to understand the Court's standardless exposition of this concept today.

The Court expresses concern that allowing judicial enforcement of "agencies' observance of a particular, statutorily prescribed procedure" would "transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3." *Ante,* at 576, 577. In fact, the principal effect of foreclosing judicial enforcement of such procedures is to transfer power into the hands of the Executive at the expense—not of the courts—but of Congress, from which that power originates and emanates.

Under the Court's anachronistically formal view of the separation of powers, Congress legislates pure, substantive mandates and has no business structuring the procedural manner in which the Executive implements these mandates. To be sure, in the ordinary course, Congress does legislate in black-and-white terms of affirmative commands or negative prohibitions on the conduct of officers of the Executive Branch. In complex regulatory areas, however, Congress often legislates, as it were, in procedural shades of gray. That is, it sets forth substantive policy goals and provides for their attainment by requiring Executive Branch officials to follow certain procedures, for example, in the form of reporting, consultation, and certification requirements.

The Court recently has considered two such procedurally oriented statutes. In *Japan Whaling Assn.* v. *American Cetacean Society,* 478 U. S. 221 (1986), the Court examined a

statute requiring the Secretary of Commerce to certify to the President that foreign nations were not conducting fishing operations or trading which "diminis[h] the effectiveness" of an international whaling convention. *Id.*, at 226. The Court expressly found standing to sue. *Id.*, at 230–231, n. 4. In *Robertson* v. *Methow Valley Citizens Council*, 490 U. S. 332, 348 (1989), this Court considered injury from violation of the "action-forcing" procedures of the National Environmental Policy Act (NEPA), in particular the requirements for issuance of environmental impact statements.

The consultation requirement of § 7 of the Endangered Species Act is a similar, action-forcing statute. Consultation is designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species. Once consultation is initiated, the Secretary is under a duty to provide to the action agency "a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U. S. C. § 1536(b)(3)(A). The Secretary is also obligated to suggest "reasonable and prudent alternatives" to prevent jeopardy to listed species. *Ibid.* The action agency must undertake as well its own "biological assessment for the purpose of identifying any endangered species or threatened species" likely to be affected by agency action. § 1536(c)(1). After the initiation of consultation, the action agency "shall not make any irreversible or irretrievable commitment of resources" which would foreclose the "formulation or implementation of any reasonable and prudent alternative measures" to avoid jeopardizing listed species. § 1536(d). These action-forcing procedures are "designed to protect some threatened concrete interest," *ante*, at 573, n. 8, of persons who observe and work with endangered or threatened species. That is why I am mystified by the Court's unsupported conclusion that "[t]his is not a case where plaintiffs

are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." *Ante,* at 572.

Congress legislates in procedural shades of gray not to aggrandize its own power but to allow maximum Executive discretion in the attainment of Congress' legislative goals. Congress could simply impose a substantive prohibition on Executive conduct; it could say that no agency action shall result in the loss of more than 5% of any listed species. Instead, Congress sets forth substantive guidelines and allows the Executive, within certain procedural constraints, to decide how best to effectuate the ultimate goal. See *American Power & Light Co.* v. *SEC,* 329 U. S. 90, 105 (1946). The Court never has questioned Congress' authority to impose such procedural constraints on Executive power. Just as Congress does not violate separation of powers by structuring the procedural manner in which the Executive shall carry out the laws, surely the federal courts do not violate separation of powers when, at the very instruction and command of Congress, they enforce these procedures.

To prevent Congress from conferring standing for "procedural injuries" is another way of saying that Congress may not delegate to the courts authority deemed "executive" in nature. *Ante,* at 577 (Congress may not "transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3"). Here Congress seeks not to delegate "executive" power but only to strengthen the procedures it has legislatively mandated. "We have long recognized that the nondelegation doctrine does not prevent Congress from seeking assistance, within proper limits, from its coordinate Branches." *Touby* v. *United States,* 500 U. S. 160, 165 (1991). "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a certain degree of discretion to executive *or judicial actors.*" *Ibid.* (emphasis added).

Ironically, this Court has previously justified a relaxed review of congressional delegation to the Executive on grounds that Congress, in turn, has subjected the exercise of that power to judicial review. *INS* v. *Chadha,* 462 U. S. 919, 953–954, n. 16 (1983); *American Power & Light Co.* v. *SEC,* 329 U. S., at 105–106. The Court's intimation today that procedural injuries are not constitutionally cognizable threatens this understanding upon which Congress has undoubtedly relied. In no sense is the Court's suggestion compelled by our "common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Ante,* at 560. In my view, it reflects an unseemly solicitude for an expansion of power of the Executive Branch.

It is to be hoped that over time the Court will acknowledge that some classes of procedural duties are so enmeshed with the prevention of a substantive, concrete harm that an individual plaintiff may be able to demonstrate a sufficient likelihood of injury just through the breach of that procedural duty. For example, in the context of the NEPA requirement of environmental-impact statements, this Court has acknowledged "it is now well settled that NEPA itself does not mandate particular results [and] simply prescribes the necessary process," but *"these procedures are almost certain to affect the agency's substantive decision." Robertson* v. *Methow Valley Citizens Council,* 490 U. S., at 350 (emphasis added). See also *Andrus* v. *Sierra Club,* 442 U. S. 347, 350–351 (1979) ("If environmental concerns are not interwoven into the fabric of agency planning, the 'action-forcing' characteristics of [the environmental-impact statement requirement] would be lost"). This acknowledgment of an inextricable link between procedural and substantive harm does not reflect improper appellate factfinding. It reflects nothing more than the proper deference owed to the judgment of a coordinate branch—Congress—that certain procedures are directly tied to protection against a substantive harm.

In short, determining "injury" for Article III standing purposes is a fact-specific inquiry. "Typically . . . the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen* v. *Wright,* 468 U.S., at 752. There may be factual circumstances in which a congressionally imposed procedural requirement is so insubstantially connected to the prevention of a substantive harm that it cannot be said to work any conceivable injury to an individual litigant. But, as a general matter, the courts owe substantial deference to Congress' substantive purpose in imposing a certain procedural requirement. In all events, "[o]ur separation-of-powers analysis does not turn on the labeling of an activity as 'substantive' as opposed to 'procedural.'" *Mistretta* v. *United States,* 488 U.S. 361, 393 (1989). There is no room for a *per se* rule or presumption excluding injuries labeled "procedural" in nature.

### III

In conclusion, I cannot join the Court on what amounts to a slash-and-burn expedition through the law of environmental standing. In my view, "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury* v. *Madison,* 1 Cranch 137, 163 (1803).

I dissent.