# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3404

_____

|  |  |  |
|---|---|---|
|  | * |  |
| United States of America; | * |  |
| State of Missouri, | * |  |
|  | * |  |
| Plaintiffs – Appellees, | * |  |
|  | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
|  | * | District of Missouri. |
| Metropolitan St. Louis Sewer District, | * |  |
|  | * |  |
| Defendant – Appellee, | * |  |
|  | * |  |
|  | * |  |
| Missouri Coalition for the Environment | * |  |
| Foundation, | * |  |
|  | * |  |
| Intervenor – Appellee, | * |  |
|  | * |  |
|  | * |  |
| Missouri Industrial Energy Consumers, | * |  |
|  | * |  |
| Intervenor – Appellant. | * |  |
|  | * |  |
| _____ | * |  |
|  | * |  |
| Metropolitan St. Louis Sewer District, | * |  |
|  | * |  |
| Counter Claimant, | * |  |
|  | * |  |
| v. | * |  |

State of Missouri,

        Counter Defendant.

                *
                *
                *
                *

_____

Submitted: May 14, 2009
Filed: June 22, 2009

_____

Before WOLLMAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

The Missouri Industrial Energy Consumers (MIEC), an association of businesses formed to address its members' concerns about utility services, moved to intervene in an enforcement action filed against the Metropolitan St. Louis Sewer District (District) by the United States and the State of Missouri under the Clean Water Act, 33 U.S.C. § 1251 et seq. The district court[1] denied the motion for lack of standing. MIEC appeals, and we affirm.

I.

The District manages a sewer and wastewater system for approximately 1.4 million residents and other users in the St. Louis area. The complaint filed by the United States and the State of Missouri alleges that from 2000 to 2005, the District discharged raw sewage into local waterways and otherwise violated its state issued permits. It alleges that the discharges have resulted from "inadequate flow capacity

_____

[1]The Honorable Carol E. Jackson, Chief Judge, United States District Court for the Eastern District of Missouri.

in the collection system and at the wastewater treatment plants; . . . aged and corroded pipes and force mains; illegal and improper cross-connections between sanitary and stormwater sewers; [and] poor maintenance," among other causes. The plaintiffs seek civil penalties for each violation and an injunction directing the District to come into "permanent and consistent compliance" with the Clean Water Act (Act) and to minimize the imminent and substantial risks to human health posed by the discharge of raw sewage.

Based on these alleged violations, the Missouri Coalition for the Environment Foundation (Coalition), a nonprofit organization dedicated to preserving and enhancing the state's environment, served the District with notice of its intent to file a citizen suit under the Act. 33 U.S.C. § 1365(b)(1)(A) (2009). After the United States and Missouri filed this action, the Coalition sought to intervene under § 1365(b)(1)(B), which grants citizens a right to intervene if the government is already prosecuting an enforcement action. See Fed. R. Civ. P. 24(a)(1). The district court granted the Coalition's unopposed motion to intervene.

MIEC is a general business trade association with seven members who discharge into the District's wastewater system, and pay user rates and fees amounting to 5% of the District's revenues. These members are Anheuser-Busch, The Boeing Company, Chrysler Corporation, Hussmann Corporation, Monsanto, Pfizer, and Procter & Gamble. MIEC members hold seven of the 220 industrial wastewater discharge permits issued by the District. Such permits authorize the holder to discharge a specific volume of wastewater at a specified rate and require monitoring of the volume and pollutant levels in the wastewater discharged.

MIEC filed a motion to intervene in this case as a neutral party for the limited purpose of participating in "discussions, negotiations, mediations, hearings, trials and/or settlements" relating to the remedy. More specifically, MIEC wants to be a

party to proceedings and discovery regarding "the scope of the remedial work contemplated, the time frame when the proposed remedial work needs to be completed, the environmental impacts . . . , and the financing options regarding the proposed remedial work." It expressed concern that any injunction or consent decree imposed on the District might result in increased user rates and fees for its members. It also prayed that the court enter an order "ensuring that the remedy is protective of the environment, compliant with the Clean Water Act, and will not unreasonably burden the [District's] ratepayers." MIEC argued that it had a statutory right to intervene under Federal Rule of Civil Procedure 24(a)(1) and 33 U.S.C. § 1365(b)(1)(B), as the Coalition had. It also sought to intervene as a matter of right under Rule 24(a)(2) and permissively under Rule 24(b). While the District supports MIEC's intervention, the United States and the Coalition oppose it. The State of Missouri takes no position on the issue.

The district court denied the motion after determining that MIEC lacked the Article III standing necessary for intervention because its alleged injuries were too speculative and not particularized. The denial of a motion to intervene of right is immediately appealable as a final judgment, South Dakota v. U.S. Dep't of Interior, 317 F.3d 783, 785 n.2 (8th Cir. 2003), and our review is de novo. Med. Liab. Mut. Ins. Co. v. Alan Curtis LLC, 485 F.3d 1006, 1008 (8th Cir. 2007).

II.

In our circuit, a party seeking to intervene must establish Article III standing in addition to the requirements of Rule 24.[2] Mausolf v. Babbitt, 85 F.3d 1295, 1300 (8th Cir. 1996). To demonstrate standing, a plaintiff must clearly allege facts showing an injury in fact, which is an injury to a legally protected interest that is "concrete, particularized, and either actual or imminent." Curry v. Regents of the Univ. of Minn., 167 F.3d 420, 422 (8th Cir. 1999). The purpose of the imminence requirement is "to ensure that the alleged injury is not too speculative . . . [and] that the injury is certainly impending." Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 n.2 (1992) (quotation omitted). The plaintiff must also show that the alleged injury is fairly traceable to the defendant's conduct and that a favorable decision will likely redress the injury. Id. at 560–61.

When a party seeks to dismiss a suit for lack of standing, we "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501 (1975). The same standards apply when a party opposes a motion to intervene. Rule 24(c) requires an intervening party to submit a "pleading that sets out the claim or defense for which

---

[2]MIEC points out the circuit split regarding whether an intervenor must demonstrate standing. Compare San Juan County v. United States, 503 F.3d 1163, 1172 (10th Cir. 2007) (intervenor need not have standing "so long as another party with constitutional standing *on the same side* as the intervenor remains in the case"), and Purnell v. City of Akron, 925 F.2d 941, 948 (6th Cir. 1991) (citing U.S. Postal Serv. v. Brennan, 579 F.2d 188, 190 (2d Cir. 1978) (once the existence of a case or controversy is established between existing parties, there is no need to require standing of intervenor)), with Mausolf, 85 F.3d 1295 (intervenor asks court to decide merits of a dispute and therefore must have standing), and Building & Constr. Trades Dep't, AFL-CIO v. Reich, 40 F.3d 1275, 1282 (D.C. Cir. 1994) (intervenor participates on equal footing with original parties and must meet same Article III requirements). MIEC urges us to revisit Mausolf, but we see no reason to do so.

intervention is sought."  MIEC did not submit a pleading asserting either a claim or defense, but it did submit a statement of interest explaining why it seeks intervention and requesting the right to participate in settlement discussions.

Appellees argue that MIEC's failure to submit a pleading is sufficient to deny its motion to intervene, but we conclude that the statement of interest satisfies Rule 24(c) because it provides sufficient notice to the court and the parties of MIEC's interests.  Accord Beckman Indus. v. Int'l Ins. Co., 966 F.2d 470, 474 (9th Cir. 1992); Spring Constr. Co., Inc. v. Harris, 614 F.2d 374, 376–77 (4th Cir. 1980).  MIEC also submitted affidavits from representatives of four member companies explaining their concerns about the impact of this lawsuit on their operations.

In the district court MIEC expressed concern that the District would increase sewer rates in order to pay civil penalties and to fund the improvements necessary to bring its system into compliance.  MIEC also asserted interests in a reliable and viable sewer system and in the quality of the local environment.  The district court determined that because MIEC sought to intervene as a neutral party it could not assert harm to its members' environmental interests and that it was a matter of "pure conjecture" whether the lawsuit would affect the reliability of the sewer system.  It also concluded that sewer rates would increase only if (1) the District were found liable, (2) the court were to impose civil penalties or an injunction requiring significant infrastructure improvements, and (3) the District were to decide to pass on the costs of compliance to ratepayers rather than raising capital in some other way.  The district court conceded that this sequence of events would not be impossible, but concluded that it was too speculative to create standing.

At the outset we note that MIEC cannot assert environmental injury on behalf of its members.  An association has standing to assert the claims of its members if "the interests it seeks to protect are germane to the organization's purpose."  Hunt v. Wash.

-6-

Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). MIEC nowhere states that environmental protection or aesthetic and recreational interests are relevant to its members' purpose in joining together. Its brief indicates that MIEC's purpose is "to represent its industrial members' unique commercial interests in utility matters." Additionally, as the district court noted, MIEC's asserted neutrality as to whether the District violated the Clean Water Act is inconsistent with an assertion that the harm to regional rivers and streams injures its members.

MIEC next asserts an interest in the reliability and viability of the District's system, but it does not explain how any remedy that might be imposed in this case will threaten the reliability of the system. The complaint seeks to improve reliability in that it seeks to remedy the poor maintenance and insufficient capacity causing the permit violations which have occurred. In addition, MIEC shares its interest in the reliability of the system with all of the 1.4 million users, so it is not the kind of concrete, particularized interest that establishes standing. See Nolles v. State Comm. for the Reorg. of Sch. Dists., 524 F.3d 892, 900 (8th Cir. 2008) (generalized grievance shared in common by all voters is not a personalized injury).

MIEC is properly situated to assert the utility related economic interests of its members, but we agree with the district court that the possibility of increased sewer rates is not an imminent injury. MIEC argues that each step in the sequence of events found unlikely by the district court is instead highly probable. First, it asserts that most enforcement cases of this type result in settlement and a consent decree rather than a finding of liability after trial. It also contends that any remedy imposed would almost certainly require infrastructure upgrades because plaintiffs' complaint focuses on infrastructure deficiencies as the cause of the Clean Water Act violations. See South Dakota v. Ubbelohde, 330 F.3d 1014, 1024–25 (8th Cir. 2003) (looking at relief sought by plaintiff to determine whether its prevailing would cause imminent injury to a potential intervenor). MIEC argues there is "nothing remote or speculative" about

whether the District will pass on the costs of compliance to its customers, for it has stated that it "does not have sufficient funds to prevent the non-compliance alleged in Plaintiffs' Complaint or to satisfy any judgment that may be entered against it in this lawsuit, without raising its wastewater user charges or user fees."

The context of the District's statement shows, however, that it is not an admission that it will raise its rates.  The statement was part of a counterclaim it filed against the State of Missouri, alleging that because state law limits its ability to raise rates,[3] and because these user fees are its only revenue stream, the state is liable for the entire cost of any judgment against the District as provided in 33 U.S.C. § 1319(e). The District was not expressing an intent to raise rates, but declaring that it considers itself constrained from doing so.  Thus, it is questionable that any consent decree would be able to determine the means by which the District would pay for system improvements.

The District is also constrained by its own charter from committing to raise fees as part of any enforceable consent decree, even if it were inclined to do so.  First, the District's staff must propose a rate increase to the Board of Trustees and the Rate Commission.  After public hearings, the Rate Commission may issue a rate recommendation report to the board, which can reject the recommendation if its finds that it "imposes an unfair or excessive burden on one or more classes of ratepayers."

The constraints on the District's ability to raise rates, combined with the District's pursuit of indemnification from the state for the cost of complying with any

---

[3]The Missouri Constitution prohibits political subdivisions such as the District "from increasing the current levy of an existing  tax, license or fee . . . without the approval of the required majority of the qualified voters of that . . . political subdivision."  See Mo. Const. art. X, § 22(a).

judgment or consent decree, show that a rate increase is no more than a "conjectural" or "hypothetical" outcome of this lawsuit. See Defenders of Wildlife, 504 U.S. at 560. Moreover, any judgment or consent decree will likely establish what the District must do to comply, rather than specify how the District will pay for the needed measures. It would be up to the District to determine whether rate increases are necessary and legally permissible through the process described in its charter.

MIEC argues that the circumstances creating its economic injury are no more speculative than those in South Dakota v. Ubbelohde, 330 F.3d 1014. When the Army Corps of Engineers (Corps) planned to release water from a South Dakota reservoir in order to maintain flows in the Missouri River for downstream recreational and navigational purposes, South Dakota filed for an injunction based on its interest in protecting the fisheries in the reservoir. Id. at 1019. Several downstream entities moved to intervene, claiming that they would be harmed if the court's ruling lead to decreased water flow. The district court concluded that a preliminary injunction preventing the Corps from releasing water from the South Dakota reservoir would not cause actual or imminent injury downstream because the Corps could release water from other reservoirs on the river. We reversed, noting that South Dakota's requested permanent relief would require the Corps to prevent irreparable harm to fisheries when making future decisions about management of the Missouri River "when the harm is inflicted to benefit downstream navigation." Id. at 1024. Because such relief might force the Corps "to reduce downstream flows in drought conditions to maintain water levels at all of the reservoirs," we concluded that the "intervenors had presented sufficient evidence of a threatened injury to give them standing." Id. at 1024–25.

The link between plaintiffs' requested relief and the possibility of harm to MIEC is less direct and more contingent in this case than in Ubbelohde. Ubbelohde concerned a single, nonfungible resource—if water were retained in the reservoir, it could not be available for downstream use. In contrast, if plaintiffs were to prevail in

this case MIEC would not unavoidably be harmed economically because the District may use alternate means to pay for its compliance. In <u>Ubbelohde</u>, South Dakota requested a remedy that would specifically elevate its interest in protecting fisheries above the downstream interests in navigation. The plaintiffs' requested remedy here, in contrast, does not seek to compel the District to fund its compliance in any particular way and makes no reference to MIEC's asserted economic concerns.

In its reply brief MIEC argues that the eventual remedy here might affect the terms of its members' industrial wastewater discharge permits by restricting the volume of discharge allowed or requiring pretreatment of the wastewater. In the district court, however, MIEC did not identify changes to industrial wastewater discharge permits as one of its injuries. Instead, MIEC focused almost exclusively on its interest in "making sure that [the District's] rates are maintained at reasonable levels." Although MIEC mentioned in its district court brief that its members are required to have industrial discharge permits, it did not place any of these permits in the record. While MIEC did provide a hyperlink to an example permit in its reply brief, we must consider the record and allegations as they existed in the district court. <u>See</u> <u>Minn. Fed'n of Teachers v. Randall</u>, 891 F.2d 1354, 1360 n.9 (8th Cir. 1989).

Even if MIEC had raised this discharge permit problem in the district court, nothing in the record suggests that the remedy sought by plaintiffs would affect these permits. The complaint does not refer to industrial wastewater discharges as a contributor to the overflow problem; instead it focuses on the deficient infrastructure. MIEC contends that because infrastructure upgrades will take time to complete, the only way that the District could readily comply with an injunction from further illegal discharges is by restricting the wastewater volume released into its system by permit holders. This argument assumes without basis that the court will impose injunctive relief insensitive to the longer term nature of the needed upgrades, rather than imposing a compliance schedule. It is even more unlikely that an enforcement action

-10-

which focuses on insufficient system capacity would require wastewater dischargers to pretreat their wastewater, because pretreatment would address water quality, not quantity. MIEC notes that consent decrees in other enforcement cases have included terms affecting industrial wastewater discharge permit holders, but whether an order or consent decree in this case would affect these permits is a matter of speculation and therefore insufficient to support standing.

We conclude that MIEC has not adequately alleged that it will suffer a concrete and particularized injury. In addition, MIEC does not even attempt to establish that its injury is fairly traceable to the challenged action and that its injury is likely to be redressed by a favorable decision—two other elements of Article III standing that a party invoking federal jurisdiction must show. Defenders of Wildlife, 504 U.S. at 561. MIEC's neglect of these elements, together with its failure to demonstrate injury in fact, confirms our conclusion that it lacks standing to intervene.

III.

Aside from the question of standing, there is the question whether MIEC has a right to intervene under either Rule 24(a)(1) or 24(a)(2). Rule 24(a)(1) allows intervention as a matter of right when a federal statute confers an "unconditional right to intervene" on the moving party. MIEC contends that it has such a right under 33 U.S.C. § 1365(b)(1)(B), which states that "any citizen may intervene as a matter of right" if the government is already diligently prosecuting an enforcement suit under the Clean Water Act. MIEC argues that the Act's broad definition of "citizen" as "a person or persons having an interest which is or may be adversely affected," id. § 1365(g), allows intervention as a defendant or a neutral. MIEC cites a Sixth Circuit decision that allowed a party to intervene as a defendant in a Clean Water Act enforcement action based on a broad view of § 1365(b)(1)(B). See Ohio ex rel. Brown v. Callaway, 497 F.2d 1235, 1242–43 (6th Cir. 1974).

Section 1365(b)(1)(B) must be interpreted consistent with the rest of the Act's citizen suit provision, however. The Act creates a private right of action whereby "any citizen may commence a civil action on his own behalf against" any person who is alleged to be in violation of the Act. Id. § 1365(a)(1). A private action may not be commenced, however, "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action . . . to require compliance . . . , but in any such action in a court of the United States any citizen may intervene as a matter of right." Id. § 1365(b)(1)(B). The right to intervene is conferred in the same sentence that limits the rights of citizens who would otherwise bring private enforcement actions, which suggests that Congress intended to confer that right only on those particular citizens. MIEC's reading of the Act would mean that any ratepayer whose financial interests might be adversely affected by a government filed enforcement action and who could show standing could intervene as of right. Such a plenary right of intervention would make these enforcement actions unmanageable. We therefore conclude that the better interpretation of § 1365(b)(1)(B), is that only a citizen whose suit has been displaced by the government action is entitled to intervene.

Identical intervention provisions in the Safe Drinking Water Act and Clean Air Act have been interpreted not to encompass entities seeking to intervene as defendants. See 42 U.S.C. § 300j-8(b)(1)(B); id. § 7604(b)(1)(B). In United States v. City of New York, 198 F.3d 360, 364 (2d Cir. 1999), the court held that a group of water ratepayers seeking to block government enforcement of the Safe Drinking Water Act could not intervene under a provision identical to § 1365(b)(1)(B) because private suits under that statute were limited to parties seeking to enforce standards, and the right to intervene must be similarly limited. The Third Circuit rejected an attempt by a group of state legislators to intervene as defendants in an action under the Clean Air Act because the "citizen suit provision of the Clean Air Act provides a right to intervene to enforce the law; it does not confer a right to intervene on behalf of an alleged violator or to seek to inhibit enforcement." Del. Valley Citizens' Council for Clean Air v. Pennsylvania, 674 F.2d 970, 973 (3d Cir. 1982).

These cases involved entities seeking to block enforcement, which is not the case here, at least on the face of MIEC's statement of interest. Intervention by an avowedly neutral party would be inconsistent with our requirement that a party may intervene under § 1365(b)(1)(B) only by filing a complaint in intervention that sufficiently alleges a violation of the Act. See United States v. Metro. St. Louis Sewer Dist., 883 F.2d 54, 55–56 (8th Cir. 1989). The Second Circuit has limited intervention under § 1365(b)(1)(B) on similar grounds, by holding that a citizen group may not intervene in an action brought by the United States to enforce a provision of the Act that is outside the scope of the Act's citizen suit provision. United States v. Hooker Chems. & Plastics Corp., 749 F.2d 968, 978 (2d Cir. 1984). Since a citizen is only able to join a government action to enforce a provision if it would be able to bring that action itself under § 1365(a), a citizen should not be able to intervene when it is not seeking to enforce the Act at all.

We conclude that the Clean Water Act requires citizens seeking to intervene under § 1365(b)(1)(B) to show that they are able to bring a private enforcement action in the first instance. MIEC's dominant concerns about the expense of the District coming into compliance strongly suggests that it would be disinclined to file an enforcement action. Moreover, MIEC lacks the organizational standing to assert its members' alleged environmental interests, which would be required for it to file a citizen suit under § 1365(a). Accordingly, MIEC is excluded from the § 1365(b)(1)(B) right of intervention and cannot intervene under Rule 24(a)(1).

Nor can MIEC establish a right to intervene under Rule 24(a)(2), which allows intervention by anyone who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." See also Mausolf, 85 F.3d at 1299. For the purposes of Rule 24(a)(2), an asserted interest must be "significantly

protectable," see Donaldson v. United States, 400 U.S. 517, 531 (1971), which has been interpreted to mean "legally protectable." See New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co., 732 F.2d 452, 464 (5th Cir. 1984) (en banc). General economic interests are not protectable and cannot serve as the basis for intervention. See id. (holding that an economic interest in low electricity prices does not qualify as a significantly protectable interest); Greene v. United States, 996 F.2d 973, 976 (9th Cir. 1993) (even a significant economic stake in the outcome of the litigation is not a significantly protectable interest). In Curry v. Regents of the University of Minnesota, we held that student groups seeking to intervene in support of the existing system by which the university distributed funds to student groups asserted only an economic interest that did not "rise to the level of a legally protectable interest necessary for mandatory intervention." 167 F.3d at 422.

A ratepayer's interest in reasonable fees is not legally protectable.[4] For example, the First Circuit denied a motion to intervene by a group of electricity customers who were concerned that a lawsuit would increase their rates, noting that "[i]t is settled beyond peradventure . . . that an undifferentiated, generalized interest in the outcome of an ongoing action is too porous a foundation on which to premise intervention as of right. . . . After all, every electricity consumer . . . and every person who does business with any electricity consumer yearns for lower electric rates." Pub. Serv. Co. v. Patch, 136 F.3d 197, 205 (1st Cir. 1998). Consistent with this principle, farm interests could not intervene to defend their water district against claims that the district had operated without the proper permits because they asserted only economic interests in the district's services as opposed to property or other legal rights. See United States v. S. Fla. Water Mgmt. Dist., 922 F.2d 704, 710 (11th Cir. 1991).

---

[4]MIEC asserts on appeal that its members have legally protectable interests in their industrial wastewater discharge permits, but they did not raise this contention in the district court so we need not consider it. Furthermore, the record does not show that this action threatens their interests in the wastewater permits.

MIEC must also demonstrate that the subject matter of the action affects its interests in a direct rather than tangential way. We rejected a motion by three trade associations to intervene in Standard Heating & Air Conditioning Co. v. City of Minneapolis, 137 F.3d 567 (8th Cir. 1998), because the asserted interests were "too speculative to be 'direct, substantial and legally protectable' interests as required by Rule 24(a)(2)." Id. at 571 (quoting United States v. Union Elec. Co., 64 F.3d 1152, 1161 (8th Cir. 1995)). The case involved city regulations that required individuals in the heating and cooling, refrigeration, plumbing, and gas trades to complete a four year apprenticeship and pass a competency examination, and also governed wages in the apprenticeship program. Companies who hired technicians in these trades challenged the mandatory nature of the program, and three trade associations moved to intervene as defendants. The trade associations, which represented employers who hired apprenticed technicians, expressed concern that if participation in the apprenticeship program were voluntary, they would be at an economic disadvantage vis a vis employers who hired unapprenticed technicians to whom they could pay lower wages. We held that a "sequence of events would have to occur for the interests of the associations to be impacted by a successful challenge to the rules," and that the associations had not submitted evidence other than their speculative beliefs that these events were likely. Id.

Like the economic interests asserted in Standard Heating & Air Conditioning, MIEC's interests are "remote from the subject matter of the proceeding" and any impact is "contingent upon the occurrence of a sequence of events." Id. (quotation omitted). Whether sewer rates will increase because of this action depends on whether the state is required to pay for the cost of the judgment under 33 U.S.C. § 1319(e), and on the decisions of the District's Rate Commission and Board of Trustees—decisions that will be made after any judgment or consent decree entered in this case. As the First Circuit held in Patch, not only did the ratepayers' concerns about increased rates lack legal protection, those interests were "fatally contingent" because future rates

-15-

would be affected by numerous market variables and so the lawsuit's net effect on rates was "anybody's guess." 136 F.3d at 205–06.

A court must carefully analyze whether the proposed intervenor's asserted interest really is bound up with the subject matter of the litigation. In Medical Liability Mutual Insurance Co., 485 F.3d 1006, a plaintiff with a pending wrongful death claim against a long term care facility was not permitted to intervene in an action brought by the facility's insurer to establish the scope of insurance coverage. The proposed intervenor's interest in eventually establishing the insurance company's liability was "too remote and indirect to qualify as a cognizable interest under Rule 24(a)(2)." Id. at 1008. Here, MIEC claims no direct interest in whether the District is found to have violated the Clean Water Act; its interest is limited to how this action's financial consequences might eventually affect its members' own pocketbooks. Such an interest is too tangential to the core issues of this enforcement case to establish a right to intervene.

This case is more like Wade v. Goldschmidt, 673 F.2d 182, 185 (7th Cir. 1982) (per curiam), in which the court denied a motion to intervene in a suit alleging that the United States Department of Transportation and the State of Illinois had not complied with environmental and transportation laws when selecting the route for a new expressway and bridge. The court found that the proposed intervenors' asserted interests in the selected route were not sufficiently related to the subject matter of the action because "the decision on where this project will ultimately be built is for the executive department," while the role of the court was simply to determine whether the agencies had complied with federal law. Id. at 186. The core of this case is whether the District violated the Clean Water Act, and if so, what it must do to prevent ongoing and future violations. How the District will fund those improvements is a collateral matter for the District, not the court, to decide.

The purpose of intervention is to "promote[] the efficient and orderly use of judicial resources by allowing persons, who might otherwise have to bring a lawsuit on their own to protect their interests or vindicate their rights, to join an ongoing lawsuit instead." Mausolf, 85 F.3d at 1300. Judicial efficiency is not promoted by allowing intervention by a party with no interest upon which it could seek judicial relief in a separate lawsuit. Cf. S. Fla. Water Mgmt. Dist., 922 F.2d at 707 n.3 ("Denial of intervention cannot impair a nonparty's ability to protect its interests if that nonparty would have no legal protection for those interests in any event."). Not only would allowing MIEC to intervene produce no gains in judicial efficiency, it would most likely complicate and delay the proceedings with peripheral issues of cost and local government financing. Although MIEC would certainly like to participate in this enforcement action, "a federal case is a limited affair, and not everyone with an opinion is invited to attend." Mausolf, 85 F.3d at 1301.

MIEC has other avenues to express its concerns about rate increases and changes to the permit system that the District may propose as a result of this enforcement action. See City of New York, 198 F.3d at 367 (denial of intervention would not foreclose the appellants' opportunities to vindicate their interests in other settings). Before any consent decree can be finalized in this type of case, the government's policy is to give the public and interested persons an opportunity to "comment on the proposed judgment prior to its entry by the court." 28 C.F.R. § 50.7(a). The Department of Justice must transmit to the district court any comments submitted, id. § 50.7(b), and the district court can consider these comments when it reviews a proposed consent decree for "fairness, reasonableness, and adequacy." United States v. Metro. St. Louis Sewer Dist., 952 F.2d 1040, 1044 (8th Cir. 1992). MIEC could also seek to participate as amicus curiae to inform the district court about its concerns. MIEC has a representative on the District's Rate Commission which makes recommendations about rate changes and will have the opportunity to comment on any proposed rate increases during that public process. The type of grievances that MIEC asserts are properly advanced in these fora, not in this federal action.

-17-

Accordingly, we affirm the order of the district court denying the motion to intervene in this Clean Water Act enforcement action.

_____