# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-3437

_____

Deric James Liddell; Caldwell/NAACP,

*Plaintiffs - Appellees,*

Ken Ross, Jr.; LeDiva Pierce,

*Intervenor Plaintiffs - Appellants,*

United States of America,

*Intervenor Plaintiff - Appellee,*

v.

Special Administrative Board of the Transitional School District of the City of St. Louis,

*Defendant - Appellee,*

Special School District,

*Defendant,*

State of Missouri,

*Defendant - Appellee,*

St. Louis County; City Board; Lindbergh School District,

*Defendants,*

-------------------------------

Confluence Academy; City of St. Louis, Missouri,

*Amici on Behalf of Appellant(s)*.

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 20, 2017
Filed: July 5, 2018

_____

Before COLLOTON, BENTON, and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

In April 2016, several parties to the decades-old St. Louis public school desegregation litigation moved to enforce the 1999 Desegregation Settlement Agreement. The moving parties were plaintiffs in the original case, known as the Liddell and Caldwell-NAACP plaintiffs (the Plaintiffs), and the Special Administrative Board of the Transitional School District of the City of St. Louis (the Special Administrative Board). The Plaintiffs and the Special Administrative Board (together the Joint Movants) argued that the State, through the Missouri Department of Elementary and Secondary Education, was reallocating certain tax proceeds to St. Louis charter schools in violation of the Settlement Agreement. The Joint Movants asked the court to order the State to comply with the 1999 Desegregation Settlement Agreement by (1) discontinuing the practice of allocating the tax proceeds in question to the charter schools, and (2) reimbursing the Special Administrative Board for past wrongful allocations.

On May 31, 2016, St. Louis charter school parents Ken Ross, Jr., and LeDiva Pierce moved to intervene as plaintiffs as of right under Federal Rule of Civil Procedure 24(a)(2). Alternatively, the charter school parents sought permissive intervention under Rule 24(b). The charter school parents argue that the pending motion to enforce seeks to decrease funding for charter schools and thereby threatens their interest in "educational funding and educational opportunities" for their children. Ross and Pierce seek to intervene on behalf of themselves and "all others similarly situated."

The district court denied the charter parents' motion to intervene on the grounds that the parents lacked an injury in fact as required to establish standing to intervene. We disagree and conclude that the charter parents have standing. We therefore reverse and remand for the district court to determine in the first instance whether the charter parents meet the requirements under Rule 24 for intervention as of right or for permissive intervention.

I.

The charter parents seek to intervene as plaintiffs in litigation that has been ongoing since 1972. To provide context, we begin with a brief history of this litigation and the legislative backdrop.

In 1972, Minnie Liddell, on behalf of African American school children in St. Louis and their parents, filed suit against the St. Louis Board of Education (the City Board). Liddell alleged that the City Board and its administrators had perpetuated racial segregation and discrimination in St. Louis public schools in violation of her children's constitutional rights. *See Liddell v. Bd. of Educ.*, 469 F. Supp. 1304 (E.D. Mo. 1979).

In 1973, the district court certified the Liddell plaintiff class. In 1976, another group of students and parents, together with the NAACP, intervened in the litigation.

We refer to them as the Caldwell-NAACP plaintiffs.  *See Liddell v. Caldwell*, 546 F.2d 768, 769 (8th Cir. 1976).  In 1977, the State of Missouri, the Missouri State Board of Education, and the State Commissioner of Education were made defendants. *Liddell*, 469 F. Supp. at 1312.

In 1983, the parties agreed on a comprehensive desegregation plan that provided for a voluntary suburban transfer program, magnet schools, new education programs, capital improvements, and improved vocational education in the school district.  *Liddell v. Bd. of Educ.*, 567 F. Supp. 1037 (E.D. Mo. 1983).  The State and the City Board funded this plan.

In 1996, the State moved for a declaration that the City Board no longer operated a segregated school system and for relief from its funding obligations under the desegregation plan.  After three years of negotiations, the parties reached, and the court approved, the 1999 Desegregation Settlement Agreement (the Agreement).

Under the Agreement, the parties agreed that the City Board would continue various remediation programs.  In exchange, the St. Louis Public School District (the District) would receive a minimum of $60 million in funding per year, consisting of a combination of state aid and local tax revenue.  Senate Bill 781, passed in 1998, set forth a revised funding formula for calculating state aid to the District.  The remainder of the Agreement's funding came from a "desegregation sales tax" that St. Louis voters approved on February 2, 1999.

Senate Bill 781, in addition to providing state funding under the Settlement Agreement, created St. Louis charter schools and provided for their funding.  The 1998 law required the District to pay charter schools a per pupil portion of its state aid for each resident student who chose to attend a charter school rather than a District school.  From 1999 until 2006, however, the District did not include any

revenue raised from the desegregation sales tax in the funds that the District transferred to the charter schools.

In 2006, the General Assembly passed Senate Bill 287, which revised the state aid funding formula for public schools. *See generally* Mo. Rev. Stat. § 163.031 (2006). Senate Bill 287 allowed charter schools to be formed as "local educational agencies," meaning that St. Louis charter schools would receive aid directly from the State instead of the District. Under the 2006 law, when a charter school declares itself a local educational agency, the State must "reduce the payment made to the school district by the amount specified in this subsection and pay directly to the charter school the annual amount reduced from the school district's payment." *Id.* § 160.415.4. While Senate Bill 781 in 1998 had not required the District to pay any portion of its local tax revenue to the charter schools, Senate Bill 287 in 2006 mandated that charter students receive a per pupil percentage of local tax revenues received by the District. *Id.* § 160.415.2(1), 160.415.4.

The Joint Movants contend that since 2006, the Missouri Department of Elementary and Secondary Education (the Department), applying the revised funding formula, has reduced the funds it pays to the District and reallocated those funds to the charter schools. According to the Joint Movants, the Department considers the District's local tax revenue—including the desegregation tax revenue—in calculating the amount of aid to reallocate from the District to the charter schools.

In their motion to enforce the Agreement, the Joint Movants argue that the Agreement "mandates that the Desegregation Tax would be paid to the District only for desegregation remediation purposes." They argue that the Department, through its implementation of Senate Bill 287's funding formula, has violated the Agreement by diverting more than $42 million dollars in desegregation tax revenue to the charter schools. The Joint Movants seek an order directing the State to reimburse the District

for these revenues and to discontinue the practice of allocating desegregation tax proceeds to the charter schools.

Ross and Pierce seek to intervene as of right under Federal Rule of Civil Procedure 24(a)(2). In the alternative, they ask the court to grant them permission to intervene under Rule 24(b). The district court denied the motion, concluding that the charter parents had not satisfied the injury-in-fact requirement of Article III standing.

## II.

We generally review a district court's determination on Article III standing *de novo*. *See Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1092 (8th Cir. 2011). The Joint Movants argue that we should review for clear error in this case because the district court "relied on affidavits and exhibits in conjunction with the motion to intervene." To be sure, where a district court relies on "its own determination of disputed factual issues" to resolve a motion to dismiss, we review the findings of fact for clear error. *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990). Here, however, the district court did not base its standing determination on a resolution of disputed facts. While the charter parents did attach several exhibits with their motion to intervene, the district court discussed only allegations that appeared on the face of the motion. And even if the district court did consider the exhibits, these were "materials necessarily embraced by the pleadings," so the court was free to consider them along with the face of the motion without resolving any factual disputes. *Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 715 (8th Cir. 2017). Because the district court made no findings on disputed issues of fact and ruled based on the pleadings, we review *de novo* whether the charter parents have standing.

"An Article III case or controversy is one where all parties have standing, and a would-be intervenor, because he seeks to participate as a party, must have standing

-6-

as well." *Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996); *see Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). A prospective intervenor, then, must satisfy the familiar requirements of Article III standing. The intervenor must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To establish an injury in fact, the intervenor must show he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

We construe a motion to intervene in favor of the prospective intervenor, accepting all material allegations as true. *Tarek ibn Ziyad Acad.*, 643 F.3d at 1092. In evaluating whether the charter parents have standing, we accept as true the movants' allegations of injury, causation, and redressability, unless the pleading reflects a "sham" or "frivolity." *Kozak v. Wells*, 278 F.2d 104, 109 (8th Cir. 1960). This is the same standard that we apply in deciding a motion to dismiss. *See United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009).

The Special Administrative Board contends that allegations by themselves are insufficient, and that the movants must submit affidavits or other evidence to demonstrate standing. But the principal authority cited in support of this argument involved an assessment of standing after a final decision on the merits. *See Wittman v. Personhuballah*, 136 S. Ct. 1732, 1735 (2016). It is well established that the "manner and degree of evidence" required for a plaintiff to establish standing depends on the stage the litigation has reached. *Lujan*, 504 U.S. at 561. On a motion to intervene, the putative intervenors may establish the elements of Article III standing based on well-pleaded allegations alone.

The Special Administrative Board argues that the charter parents have not established an injury in fact because they assert injuries that are "conjectural and hypothetical." It is true that "'[a]llegations of *possible* future injury' are not sufficient" to satisfy the injury-in-fact requirement. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alteration in original) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The motion to intervene, however, included allegations of concrete harm that are definite and real. Specifically, the charter parents pleaded:

> If the Special Administrative Board prevails in its motion, Mr. Ross and Ms. Pierce, and their children, *would suffer a loss in educational funding* for teachers, facilities, and equipment necessary for their children's education. This *would erode the quality and reputation of the charter public schools* that Mr. Ross's and Ms. Pierce's children attend.

Taking this well-pleaded allegation as true, the charter schools will suffer a loss of funding and a decline in quality if the Joint Movants prevail. This alleged injury to the Ross and Pierce families, resulting from the plaintiffs' requested transfer of tens of millions of dollars away from the schools that the Ross and Pierce children attend, is neither conjectural nor hypothetical and is sufficiently imminent to constitute an injury in fact.

The Joint Movants also complain that the charter parents allege injury only to third parties, namely the charter schools, rather than to themselves and their children. But the charter parents have alleged their own direct interest in the quality of the charter schools. They pleaded that the educational funding that the charter schools receive and have received—insofar as it supports teachers and funds school facilities and equipment—is "necessary" for their children's education. The charter parents do not rest their claim solely on the economic interests of the charter schools, but allege an injury to their children's educational interests and opportunities. Parents have standing to sue when practices and policies of a school threaten their rights and interests and those of their children. *See, e.g.*, *Parents Involved in Cmty. Sch. v.*

-8-

*Seattle Sch. Dist. No. 1*, 551 U.S. 701*,* 718-19 (2007); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 224 n. 9 (1963).  The charter parents, therefore, adequately pleaded imminent injury that threatens them and their children personally.  We conclude that the charter parents have satisfied the injury-in-fact requirement of Article III standing.

To satisfy the traceability and redressability requirements of Article III standing, the charter parents must establish that their injury is "fairly traceable to the challenged conduct of the defendant"—here, the State of Missouri—and that their injury is "likely to be redressed by a favorable decision." *Spokeo*, 136 S. Ct. at 1547.  The charter parents pleaded that, if the Joint Movants prevail, the charter schools would lose funding, and the quality of their children's education would suffer as a result.  The motion to enforce the settlement agreement is aimed at the State and seeks an order directing the State to reduce funding to charter schools.  The State would thus be compelled to cause the alleged injury if the motion to enforce succeeds, so the alleged injury is fairly traceable to the State.  *See Tarek ibn Ziyad Acad.*, 643 F.3d at 1093.  The alleged injury also would be redressed by a favorable decision:  if the Joint Movants do not prevail on their motion to enforce, the State will not be required to reimburse the District for past allocations of the desegregation tax revenue, and the State may continue to allocate a portion of the tax revenue to the charter schools.

The Joint Movants argue that the charter parents lack standing because they do not have a legally protectable interest under the Agreement.  They draw our attention to *Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952 (8th Cir. 2002), where this court concluded that "strangers to a consent decree generally do not have standing to enforce a consent decree." *Id.* at 958.  *Pure Country* said that a third party seeking to enforce a decree must show "that the parties to the consent decree not only intended to confer a benefit upon that third party, but also intended to give that third party a legally binding and enforceable right to that benefit." *Id.*  In this case, however, the charter parents do not seek to enforce an agreement to which they are

strangers. They contend, rather, that the Joint Movants are seeking to expand the settlement agreement beyond its boundaries in a way that would harm non-parties to the agreement. The rationale of *Pure Country* does not forbid a third party who would be injured by a purported enforcement of a settlement agreement from intervening to urge that the agreement be confined to what the putative intervenors consider to be its proper scope.

III.

The district court denied the charter parents' motion to intervene on standing grounds alone and did not consider the merits of their motion. The parties have argued the timeliness and the merits of the motion in this appeal, but we conclude that the district court should consider those issues in the first instance, especially because not all issues are purely legal questions subject to *de novo* review by this court. If the district court concludes that the motion to intervene is timely, then it should proceed to the merits and determine whether the motion meets the requirements for mandatory intervention under Rule 24(a)(2), or whether the charter parents should be permitted to intervene under Rule 24(b). The order dismissing the motion to intervene for lack of standing is reversed, and the case is remanded for further proceedings.

_____