NYGAARD, Circuit Judge,
with whom Circuit Judges SCIRICA, FUENTES, and FISHER join, dissenting.
The majority’s grant of standing to parties who have no injury, either actual or contingent, is a departure from the well-established requisite of an injury in fact, and it has broad deleterious implications for the jurisprudence of Article III standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 564 n. 2, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To be clear, nothing in the record — amassed over five years with the full participation of the excess insurers — and nothing in the Reorganization Plan itself, substantiates the excess insurers’ claims that they have incurred or will incur an injury in fact as a result of Global’s petition for reorganization under Chapter 11 of the Bankruptcy Code.
Moreover, fully aware of past abuse in the realm of silicosis claims in unrelated cases in other courts, the Bankruptcy Court in this case established the facial legitimacy of claims by requiring a proffer of information from claimants under penalty of perjury. Most importantly, Hartford, Century and AIG have conceded any challenge to the court’s factual findings in this regard.[1] Relying upon these findings, and those regarding the reorganized entity’s financial viability (that are also unchallenged by the excess insurers), the Bankruptcy Court already established the necessity of the Silica Trust.[2] Finally, *217 from a practical perspective, the majority’s remand will needlessly delay an already protracted proceeding to rehash a record that is already complete, a move that may very well imperil financing on which the reorganized entity is relying to succeed. This contravenes the intent of the Bankruptcy Code, and seriously undermines a process authorized by Congress to address asbestos claims. See 11 U.S.C. § 524(g).[3] For all of these reasons, I dissent.
The excess insurers conjure up an injury through the Plan’s supposed impact on the insurance contracts. However, three technical amendments to the Reorganization Plan, explicitly considered by the Bankruptcy Court, ensure that the contractual relationship between the insurers and insured emerges post-reorganization unchanged.
4.4.1 No Preclusion from Asserting Claims, etc. Nothing in the GIT Plan, in any of the Plan Documents, or in the Confirmation Order shall preclude any Entity from asserting in any proceedings any and all claims, defenses, rights, or causes of action that it has or may have under or in connection with any of the APG Silica Trust Policies, except claims, defenses, rights or causes of action held by an insurer that are based on or arise out of any “anti-assignment” provision(s) in such policies. Subject to the foregoing, and to the provisions of Section 4.4.2 and 4.4.3, nothing in the GIT Plan, in any of the Plan Documents, or in the Confirmation Order shall be deemed to waive any claims, defenses, rights or causes of action that any Entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in the APG Silica Trust Policies, including (but not limited to) any and all such claims, defenses, rights or causes of action based upon or arising out of any APG Silica Trust Claim that is liquidated, resolved, discharged, channeled or paid in connection with the GIT Plan.
4.4.2 No Impairment of Rights. Notwithstanding anything to the contrary in the GIT Plan, in any of the Plan Documents, or in the Confirmation Order, nothing in the GIT Plan, the Plan Documents or the Confirmation Order (including any other provision that purports to be preemptory or supervening) shall in any way operate to, or have the effect of, impairing any insurer’s legal, equitable or contractual rights under the APG Silica Trust Policies in any respect other than the enforcement of any “anti-assignment” provision(s) in such policies. Subject to the foregoing, the rights of the insurers shall be determined according to the terms of the APG Silica Trust Policies, as applicable.
4.4.3 No Assertion of Preclusion, etc. Notwithstanding anything to the contrary in the GIT Plan, in any of the Plan Documents, or in the Confirmation Order, under no circumstances shall any person or Entity be permitted to assert issue preclusion or claim preclusion, waiver, estoppel, consent, or any other *218 legal or equitable theory against any insurer under any APG Silica Trust Policy as to the existence, enforceability or amount of any APG Silica Claim or Demand on the basis of the submission, valuation, resolution and/or payment of any APG Silica Trust Claim by the APG Silica Trust. The submission of an APG Trust Claim by a claimant, and valuation, resolution and/or payment of an APG Silica Trust Claim by the APG Silica Trust, shall be wholly without prejudice to any and all rights of the parties in all other contexts or forums, and shall not be deemed (unless otherwise determined by a Court of competent jurisdiction) to be a triggering event for liability under any APG Silica Trust Policy.
Third Amended Plan of Reorganization of Global Industrial Technologies, Inc., ET AL., 23, December 8, 2005, ECF No. 7827. The record contains lengthy, substantive, discussion of these provisions, making clear the intent of the Trustee to mirror the language used in In re Combustion Engineering, Inc., which we characterized as insurance-neutral. 391 F.3d 190, 218 (3d Cir.2004). The majority distinguishes the instant case from Combustion Engineering by asserting that the “quantum of liability” post-petition for the excess insurers is proportionately larger in this case. Yet, leaving aside for the moment the fact that the record does not support an assertion of increased liability for the excess insurers, the majority fails to explain how this is even relevant to the analysis. Combustion Engineering’s characterization of these provisions as insurance-neutral is integral to its holding and must be followed here. As a result, the majority errs factually and as a matter of law by implying that the Reorganization Plan causes an injury in fact to the excess insurers by modifying the terms of the insurance contracts.[4]
Therefore, even if we accept the worst-case scenario posited by Hartford and Century, where the Silica Trust actually settles claims in excess of the thirty-five million dollar fund established in the Plan, and it submits claims of indemnity that the excess insurers regard as beyond the scope of coverage, fraudulent, or over-valued, they are still not injured. This is so because they have the same full range of contractual rights to protect their interests for which they bargained at the inception of the insurance contracts pre-petition. Indeed, the excess insurers themselves admitted that the Silica Trust would still face the burden of first establishing its right to coverage under the pre-petition policies. For these reasons, the record does not support the majority’s assertion that these claims represent a contingent liability sufficient to ground standing. Given the multitude of variables at issue here, the only reliable points of reference with respect to the excess insurers are the insurance contracts. The fact that the policies are unchanged by the Reorganization Plan is dis-positive.
Moreover, contrary to the majority’s assertion, jurisprudence on standing does not support their position in this case. They point to the holding in Clinton v. New York, 524 U.S. 417, 429-36, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) to suggest *219 that the Supreme Court has already extended the bounds of Article III standing to include entities that present nothing more than a possibility of future impacts. Yet, as noted by the Court of Appeals for the District of Columbia, Clinton is properly read precisely for what it is: “a basic case of judicial review of legislation.” Newdow v. Roberts, 603 F.3d 1002, 1012 (D.C.Cir.2010). The entities involved here were in the highly unusual circumstance of asserting standing to challenge the President’s line item veto of specific legislative provisions that had been crafted and duly authorized by Congress for their benefit. Without the grant of standing, the parties in Clinton v. New York would have been denied access to any judicial fora to launch their case because the intended legislated benefits vanished with the veto before they became law. Within this highly unusual context, there was a clear rationale for the Supreme Court to stretch the requirements of constitutional standing to recognize specific, prospective benefits of the legislation, and the impacts of the loss of those benefits, to enable a constitutional challenge to the President’s line item veto.
The majority’s reliance upon Clinton in this case, where it is beyond question that the excess insurers will — if needed — have standing to raise contractual issues in court at the appropriate time and place, uproots long held and traditional principles of standing. See Lujan, 504 U.S. at 564 n. 2, 112 S.Ct. 2130 (“It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiffs own control.”) Moreover, in its haste to give the excess insurers standing to challenge this Reorganization Plan the majority dilutes the definition of injury in fact, with alarming consequences.
The closest that the majority comes to actually describing the impact that the Reorganization Plan might have upon the excess insurers is to say that their “quantum of liability” might be impacted in the future, or that there might be a “tangible disadvantage.” Yet, to say that an insurance company is worried that its risk for future indemnity obligations might be larger than it projected when it established the insurance policy is another way of describing the leitmotif of the insurance industry within its normal course of business. That, at some point in the future, the scope of coverage determined by an insurer at a policy’s inception may include liabilities that the insurer failed to consider when it priced the policy is of no moment to the bankruptcy proceedings. Moreover, even if an insurer may incur costs in conducting claim evaluations and other expenses in litigating those they deny, none of this puts the insurer outside of the milieu in which it operates day to day. Considering all of this, I cannot find any rationale to extend the definition of injury in fact to include the risks that occur to insurers within the normal course of their business. Particularly given the highly speculative nature of the impacts claimed here, the Bankruptcy Court correctly kept its eye on the ball, ascertaining whether the Reorganization Plan altered the contractual relationship between insurers and insured. It did not err in concluding that this relationship remains unaltered post-reorganization.
Moreover, by misapplying Clinton, the majority generally lowers, at a minimum, the threshold for injury in fact to include anyone who can conjure up the mere risk of a future business impact. The majority’s detour from the standard analytic pathway for determining contingent injury ensures that bankruptcy courts will, henceforth, be burdened with determining whether sufficient injury exists among a *220 broad new class of persons who, to obtain party in interest standing, may now allege only a fear that future business dealings with the reorganized entity may result in less profit than projected.[5] In my view, the effects of this type of approach to Article III standing beyond the realm of bankruptcy are staggering.
I agree with the majority’s statement that party in interest standing is to be broadly construed. However, I disagree that a generous interpretation of Article III standing in the bankruptcy context should extend to entities that have, in spite of ample opportunity, utterly failed to provide any evidence that the Reorganization Plan inflicts any injury upon them. Accordingly, I respectfully dissent.

. In their reply brief Hartford and Century conceded their challenges to assertions of the Bankruptcy Court’s factual error, clarifying that: “the [Bjankruptcy [Cjourt erred in granting the § 105 injunction not because its findings of fact were erroneous, but rather because it failed to make — and on the record could not make — the specific and concrete findings to support the showing of “necessity” that Continental requires." (Emphasis added.) AIG fully adopted the arguments of Hartford, and did not provide any indication to this Court that it disagrees with this particular statement. I note also that references to "Hartford,” “Century” and "AIG” are consistent with their use in the majority opinion.

. I reject the multiple inferences throughout the majority opinion that the Bankruptcy Court conducted anything less than a thorough, responsible investigation into every claim raised by the insurers. Indeed, the suggestion that the Bankruptcy Court should, on remand, conduct a "more searching review of Hartford and Century’s allegations” belies the record in this case. Having failed to impress the Bankruptcy Court with its claims of rampant fraud and collusion through nothing more than bald, unsubstantiated inference, the majority now apparently seeks to give these insurers a second bite of the apple to make a case that is fatally flawed. Unless the majority is suggesting that Bankruptcy Court should provide a forum for their premature coverage claims — an instruction that would raise further justiciability issues— it is my position that it has conducted an admirable, exhaustive review. For that rea *217 son, I believe that a section 105 injunction would be warranted even if Hartford and Century had standing.

. If the central issue for the majority is a general opposition to the use of settlement trusts to resolve claims of this sort, I regard Congress as the proper forum for resolving such concerns rather than the judiciary. See Lloyd Dixon, Geoffrey McGovern, & Amy Coombe, Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts, Rand, Institute for Civil Justice (2010). To be sure, numerous questions persist in the complex realm of asbestosis and silicosis claim litigation. Yet, we must work with the statutes, our precedent, and the record as it is, not as we wish it to be.

. In footnotes 20 and 23, the majority does not clearly articulate a position on.whether the anti-assignment provisions of this Reorganization Plan constitute a contractual injury, given our holding in Combustion Engineering that validated the Bankruptcy Code’s authorization to preempt anti-assignment policy provisions. 391 F.3d at 218-20. I interpret our holding in Combustion Engineering on anti-assignment provisions as both fully applicable to this case and regard it as binding precedent that eliminates any claim by the insurers that this provision is the source of any injury.

. One can also reasonably posit collateral complications to the general analysis of the justiciability of claims if the majority's position is applied to the doctrine of ripeness, given the obvious intent of the insurers to launch premature coverage disputes.